# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ANDREW J. MILLER**,

       Plaintiff,

vs.                                                              **No. CIV-10-171WPJ/LFG**

**DUGGERS TOW YARD, et al.**,

       Defendants,

consolidated with

**ANDREW J. MILLER**,

       Plaintiff,

vs.                                                              **No. CIV-09-1124 BB/WPL**

**OFFICE OF THE DISTRICT ATTORNEY FOR**
**THE SECOND JUDICIAL DISTRICT, et al.**,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on (i) *Defendants Robin Hammer and Mark Drebing's Motion for Summary Judgment and Memorandum Brief in Support* (Doc. 123), filed June 16, 2011; (ii) the *City Defendants' Motion for Summary Judgment and Memorandum Brief in Support* (Doc. 124), filed June 20, 2011; and (iii) pro se[1] Plaintiff Andrew Miller's *Motion to Disqualify F. Michael Hart from Representing the Intervenor* (Doc. 125), filed June 20, 2011.  The

---

[1] Miller was represented by an attorney from March 11, 2011 until May 16, 2011.  *See* Docs. 100, 118.

Court has reviewed the motions and briefs submitted by the parties, the relevant record, and the relevant authorities.  The Court denies Miller's motion and grants the Defendants' motions in part and denies them in part, as set forth below.  The Court requires Defendants Hammer, Drebing, and Barreras to show cause why summary judgment should not be granted in Miller's favor on his procedural-due-process claims.  The Court also hereby imposes a constructive trust in favor of intervenor Roberta Beale on all amounts Miller has received or will receive in settlement or as damages in this case, and hereby orders Miller, Duggers' Services, Inc., Acme Towing & Recovery, Inc., and Munos Wrecker, Inc. to inform the Court regarding the terms of their settlements and the location of any monies Miller has received, or will receive, in settlement of his claims against them.

**PROCEDURAL BACKGROUND**

On November 25, 2009, Miller, who is incarcerated, filed with this Court a Civil Rights Complaint against, among others, former Deputy District Attorney Robin S. Hammer, in her individual and official capacities, and Deputy District Attorney Mark L. Drebing, in his individual and official capacities (hereinafter jointly called the "DA Defendants"), which was assigned case number 09cv1124 BB/WPL.

On February 1, 2010, Miller filed against the DA Defendants and four private towing companies a Civil Complaint for Fraud, Conversion and Restitution in the Second Judicial District Court for New Mexico, which the DA Defendants removed to this Court.  *See* 10cv171 WPJ/LFG, Doc. 1, Ex. A (Doc. 1-1).  In this Complaint, he also asserts that "Plaintiff's civil rights were violated . . . [and] that his state and/or federal constitutional rights, privileges and/or immunities have been violated." *See id.* ¶ 24, at 13.

On April 8, 2010, the DA Defendants filed a motion to dismiss in the removed case (10cv171 WPJ/LFG), asserting that "Plaintiff's Complaint fails to state a claim for relief against them,

Plaintiff lacks standing to assert claims on behalf of other persons, Defendants enjoy sovereign immunity to New Mexico State law claims and enjoy absolute prosecutorial immunity to all claims under 42 U.S.C. §1983." Doc. 25 at 1-2. On July 1, 2010, Miller filed a *Motion to Amend Complaint* in this case. *See* Doc. 50.

On July 6, 2010, Chief U.S. District Judge Bruce D. Black *sua sponte* issued a Memorandum Opinion and Order dismissing Miller's first Complaint under 28 U.S.C. § 1915(e)(2) and Fed. R. Civ. P. 12(b)(6). *See* 09cv1124 BB/WPL, Doc. 6. Judge Black dismissed without prejudice Miller's claims of double jeopardy and prosecutorial misconduct, dismissed with prejudice Miller's claims of unreasonable seizures and violation of equal protection, and dismissed with prejudice the claims against Defendants Office of the District Attorney, Kari Brandenberg, Hammer, and Drebing. *See* 09cv1124 BB/WPL, Doc. 6 at 4-5. The Court further dismissed these Defendants as parties to the action. *See id.* at 5. But the Order directed that a summons be issued to the City on Miller's due-process claims. *See id.*

On July 23, 2010, the Court consolidated the two cases because they arise from a common nucleus of facts. *See* 10cv171WPJ/LFG, Doc. 56 at 8-10; 09cv1124 BB/WPL, Doc. 9 at 8-10. The Court then reconsidered its Order in 09cv1124 and vacated the dismissal of Miller's prosecutorial-misconduct claims, maintained the dismissal of the double-jeopardy claims, and reinstated Defendants Hammer and Drebing as Defendants[2]. *See* 10cv171WPJ/LFG, Doc. 60 at 13. The Court

---

[2] As to Miller's request for monetary damages, the DA Defendants have been reinstated only in their individual capacities because they are State employees and share in its Eleventh-Amendment immunity against suit in federal court for monetary damages for acts performed in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989) (noting that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself," but also noting that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not

denied Miller's motion for reconsideration of the dismissal of his equal-protection claim, his scope-of-seizure claim, and the dismissal of the Office of the District Attorney for the Second Judicial District as a defendant, and dismissed Defendant Brandenberg as a defendant in both of the consolidated cases. *See id.* at 14. Lastly, because the *sua sponte* dismissal with prejudice of some of Miller's claims had been issued without giving Miller an opportunity to amend, the Court granted Miller's Motion to Amend Complaint and provided him twenty-one days to amend his Complaint to state sufficient claims against proper defendants and in compliance with the Order. *See id.*

Miller filed an Amended Civil Complaint against all Defendants on August 31, 2010. *See* Doc. 62. The DA Defendants have, in their motion for summary judgment, also renewed their motion to dismiss based on the Amended Complaint, and have requested that the Court address their dismissal arguments before considering their motion for summary judgment. *See* Doc. 142 at 1. Miller settled with three of the tow companies and the Court approved their stipulated orders of dismissal. *See* Docs. 58, 70, 107. The Court dismissed without prejudice Miller's claims against Defendant E&A Kap, Inc., d/b/a Town and Country Towing, for Miller's failure to timely perfect service[3]. *See* Doc. 93. Miller has also conceded that "Defendants Carla Perez #3096 and Chadwick J. Melvin #3091 are in fact entitled to qualified immunity . . . ." Doc. 141 at 3.

After Miller settled with the tow companies, Roberta Beale filed a Motion to Intervene in this matter, *see* Doc. 87, which was granted on April 25, 2011. *See* Doc. 111. In her Complaint,

_____

treated as actions against the State") (internal quotation marks and citation omitted). Insofar as Miller may be requesting declaratory or injunctive relief regarding one of his bank accounts, the DA Defendants were reinstated in their official capacities.

[3] The Court also notes that, based on the documents submitted, E&A Kap, Inc., d/b/a Town and Country Towing played no part in storing/selling the vehicles related to Miller's due-process or conversion claims. *See* Doc. 123, Exs. 11-1 through 11-8.

Beale asserts that Miller has judicially admitted improperly taking money from her and that he used the money to promote his personal lifestyle, musical events, or concerts. *See* Doc. 112 at 2, ¶ 2. She contends that he used the money taken from her to purchase the vehicles of concern in this lawsuit. *See id.* ¶¶ 2-4. She contends that she "is entitled to a constructive trust of any amounts recovered by Miller that results from claims Miller makes as to vehicles or other property bought with money Miller stole from Beale." *Id.* ¶ 6. Beale has submitted a state-court Order granting judgment in her favor and against Miller on the issue of his liability to her for conversion. *See* Doc. 109 & Att.

## UNDISPUTED FACTS

In March 2006, Miller operated a business he called "Legal Aid Services," through which he met Beale, who was 72 years old, disabled, and who had just been involuntarily committed to a psychiatric hospital. *See* Doc. 123, Ex. 6 at 2; *id.* Ex. 1 at 1-2; Doc. 134 at 8; Doc. 87 at 2. After a series of conversations, Miller convinced Beale to give him a general, durable power of attorney to act on her behalf regarding all medical, personal, and financial decisions, and to pay him a nonrefundable flat fee of $25,000 to be her medical "liaison." *See* Doc. 123, Ex. 6 at 2; Doc. 134 at 8 and Exs. 23, 27. Beale issued a $3500 check to Miller on March 30, 2006. *See* Doc. 134 at 8 & Ex. 24. She paid him an additional $6500 on April 3, 2006, and the balance of $15,000 on April 10, 2006, while still in the psychiatric unit. *See id.* Exs. 29, 30. Beale was discharged from the psychiatric unit on April 11, 2006. *See id.* Ex. 31. Without Beale's knowledge, Miller later submitted the power of attorney to the Bank of America, swearing that Beale was "disabled or incapacitated." *See id.* Ex. 32. Miller proceeded to further deplete Beale's financial resources, ultimately cashing in approximately $550,000 in certificates of deposit and taking approximately $45,000 from her checking accounts by May 31, 2006. *See* Doc. 123, Ex. 9 at 4; Doc. 142, Att. 1 at 10. Miller was arrested on July 12, 2006. *See* Doc. 123 at 2, ¶5. A grand-jury indictment that

5

included charges of racketeering, fraud, and embezzlement was filed against him on August 1, 2006. *See id.*, Ex. 1 at 2, ¶ 7.

On July 18, 2006, and again on August 9, 2006 Defendant Officer Marigrace Barreras, an APD officer assigned as the lead detective investigating this case, obtained search warrants at the DA Defendants' direction, *see* Doc. 134, Ex. 14 at 1; Doc. 124 at 3, ¶ 5, to seize numerous vehicles that Miller had allegedly "purchased with funds which were illegally obtained" from Beale. *See, e.g.*, Doc. 134, Ex. 8 at 2-3 and Ex. 9 at 1-4. Hammer and Drebing approved the warrants. *See id.* Ex. 8 at 3, Ex. 9 at 4. Barreras understood that she was to "impound[] and store[] [the vehicles] for later disposal by the Judge." Doc. 134, Ex. 14 at 1. Accordingly, the warrants expressly provided that the officer executing the warrant was to "seize the . . . [listed] property and hold for safekeeping until further Order of the Court" and that the vehicles were to be "towed and to remain *in police custody* until released by a District Court Judge." Doc. 134, Ex. 9 at 1, 3 (italics added). But when they found the various vehicles listed in the seizure warrants, Barreras and other officers called several different private tow companies to tow and store those vehicles at their tow yards. Hammer admits she was aware that the vehicles were towed and stored at the private yards, where they were accruing storage fees, and that at least one of the tow-yard owners was confused about his legal right to dispose of the vehicles. *See* Doc. 134, Ex. 13 at 2-3; *id.* Ex. 45 at 2.

According to Hammer, "the vehicles were to be seized as evidence in the ongoing criminal investigation." Doc. 123, Ex. 1 at 2, ¶ 8. But one of Miller's former attorneys filed an unrebutted affidavit stating that Hammer further told him that "the vehicles . . . were being held *at the expense of the State* as evidence *until she forfeited them under the New Mexico Racketeering Act . . . .*" Doc. 134, Ex. 4 at 1-2 (italics added). Thus it appears undisputed that the vehicles were to be held at the State's expense and in its custody until they either were properly forfeited to the state, or returned

6

to Beale as the proceeds of racketeering by court order, or returned to Miller if no forfeiture action was filed or if they were *not* found to be the proceeds of racketeering.  *See* N.M.S.A. 1978 § 30-42-4(E)(1) (providing that persons found guilty of racketeering "shall forfeit to the state of New Mexico [] any interest acquired or maintained in violation of the Racketeering Act"); N.M.S.A. 1978 § 30-42-4(F) (Racketeering Act section providing that "[t]he provisions of the Forfeiture Act apply to the seizure, forfeiture and disposal of property described in Subsection E of this section"); N.M.S.A. 1978 31-27-2 (stating that one purpose of the Forfeiture Act is "to protect the constitutional rights of persons accused of a crime and of innocent persons holding interests in property subject to forfeiture"); N.M.S.A. 1978 § 31-27-8 B (Forfeiture Act section providing that "[s]eized property other than currency or real property, not required by federal or state law to be destroyed, shall be [] (1) placed under seal; and (2) removed to a place designated by the district court; or (3) held in the custody of a law enforcement agency").

But it is further undisputed that neither Hammer nor any other official ever filed a complaint for forfeiture of the seized vehicles under the Forfeiture Act.  *See* Doc. 134, Ex. 22 at 2; Doc. 45 at 3; N.M.S.A. 1978 31–27–5(A) ("Within thirty days of making a seizure, the state shall file a complaint of forfeiture or return the property to the person from whom it was seized.").

The City of Albuquerque's Police Department has a written policy "to provide for the . . . careful handling and preservation of all property and evidence that comes under" its control.  Doc. 151, Ex. 8, Att. 1 at 1 (APD's Procedural Order 2-08 regarding evidence and confiscated property).  And the Department also has a policy  "to actively seek forfeiture of . . . property seized for felony violations . . . as [] provided for by law."  *Id.* at 2-37 (APD Procedural Order regarding forfeiture of property).  The APD requires its investigating officers, such as Barreras, to "initiate the forfeiture procedure by completing" a form and forwarding it to the Special Investigations Division ["SID"]

7

within ten days of seizing property that *may* be subject to forfeiture. *Id.* at 2-37-1(B). If a vehicle is seized that may be forfeited under state law, it must "be towed to the 4ᵗʰ Street yards" by "a police department wrecker" if the vehicle is seized Mondays through Fridays between 6:30 a.m. and 10:30 p.m. *Id.* at 2-37-2(A). Thus, there usually are no commercial towing or storage expenses incurred for vehicles that may be later forfeited under state law for violations of law that permit forfeiture.

Under APD's forfeiture policy, the investigating officer must obtain a title/lien history on the vehicles and fill out certain forms; take photographs and tag them into evidence; and remove and return to its owner any personal property in the vehicle. *Id.* at 2-37-2(D), (E). The vehicles are then categorized according to condition and value and stored at one of two city impound areas. *See id.* at 2-37-2(E). The SID must "monitor[] the progress and time limits on all forfeiture or intended forfeiture proceedings," and must route a "forfeiture request and completed case to the department Legal Advisor, within twenty days of seizure." *Id.* 2-37-3. The department's "Legal Advisor is solely responsible for all litigation." *Id.* at 2-37-4(A). If a seized vehicle is to be returned to a legal or equitable owner instead of being forfeited, the Legal Advisor's Office notifies the department's Property Management Division, who then notifies the legal or equitable owner and physically returns the vehicle to him or her. *See id.* at 2-37-8. The APD's forfeiture policy, therefore, is consistent with state law.

Under APD policy, a vehicle seized *solely as evidence* and that is *not* intended for forfeiture, on the other hand, is normally "processed at the scene," *id.* at 2-48-5(A), and if it is not immediately processed and released to the owner, it is towed by a commercial tow service to APD's Metropolitan Forensics Science Center, where it "must be processed within 48 hours, excluding weekends," *id.* at 2-48-5(C), (E). After processing, the vehicle is towed to "the original wrecking company['s]" storage yard, which will make arrangements with the owner for release because "towing charges

need to be paid by the owner." *Id.* at 2-48-5(F). If the towed vehicle belongs to a victim or a crime

suspect, "a police hold may be initiated on a tow form . . . *for a maximum of 72 hours.*" *Id.* at 2-48-

6(A)(1) (italics added). "Vehicles towed for evidence will be stored at the wrecking yard that tows

the vehicle." *Id.* at 2-48-6(C).

> After a vehicle has been processed, the investigating officer will notify the owner of
> its release [either] by . . . complet[ing] two copies of the release form [] and giv[ing]
> one copy to the owner of the vehicle to present to the towing service . . . [or by] . .
> . complet[ing] two copies of the release form [] and deliver[ing] one copy to the
> towing service so as to authorize it to release the vehicle to the owner. The second
> copy will be forwarded to Records who will mail a photocopy to the address of the
> registered owner.

*Id.* at 2-48(D). Thus, APD policy is that, after a vehicle has been processed solely as evidence, it

must be released to the owner or victim after payment of the tow and storage fees, if any, and that

a vehicle seized for evidentiary purposes may be stored only for a maximum of three days before

it is released.

Officer Barreras was assigned the duty to "sort through property that is seized to decide

which property should be kept as evidence and which property should be released back to its original

owner." Doc. 124, Ex. A at 2. Defendant Hammer talked with Barreras about "the evidentiary

value of the [seized] property;" Hammer spoke with a representative from Acme Towing who called

seeking legal advice on disposal of Miller's vehicles in its possession; and she spoke with the City

of Albuquerque's legal counsel, who told her that the City "was unable to pay vehicle storage fees

in this case." Doc. 134, Ex. 13 at 2-3. But it is undisputed that Barreras never notified Miller that

any of the seized vehicles had been processed solely as evidence and were ready for release. *See*

Doc. 134, Ex. 12 at 2 (Miller's Affidavit stating that "he was never given any notice as to where any

of these vehicles where [sic] being stored or when they were being disposed of"). And, as noted

above, when Miller's attorneys each separately asked Hammer about the status of the vehicles, she

9

informed them that they were being held either as evidence or in anticipation of forfeiture.  *See* Doc. 134, Ex. 22 (Affidavit of Donald Kochersberger III, Miller's first attorney, swearing that he contacted Hammer regarding her intention to release the seized vehicles; that she informed him that some vehicles "were being returned to individuals other than Mr. Miller because her office and/or the [APD] had determined that they didn't belong to Mr. Miller" and that the remaining vehicles "would be held indefinitely as evidence in the case against Mr. Miller"); *Id.*, Ex. 4 at 1-2 (Affidavit of Jeffrey Jones, Miller's second attorney, swearing that he contacted Hammer in February 2008 "to inquire about the status of the vehicles that had been seized" and that she told him that "the vehicles . . . were being held at the expense of the State as evidence until she forfeited them under the New Mexico Racketeering Act . . . .").  It is undisputed that Officer Barreras told Miller's mother, who had been driving a Volvo that Miller had purchased in June 2006 and that was seized on August 11, 2006 as proceeds of racketeering and/or fraud, that she could not get the Volvo back "without a court order . . . [which] would have to be initiated by the Office of the District Attorney."  Doc. 134, Ex. 11 at 1; Doc. 151, Ex. 3 at 5.  But even though Barreras has been an APD officer for ten years and regularly "investigated cases of fraud, embezzlement, racketeering, and other white collar crimes," as a "lead detective," Doc. 123, Ex. 10 at 1, she states that she has "no knowledge of how property seized pursuant to a search warrant is forfeited or disposed of," although she believes "there may be an [APD] standard operation procedure that addresses this issue," Doc. 124,  Ex. A at 3.

As noted above, despite the fact that it appears that all vehicle seizures occurred between Monday and Friday and between 6:30 a.m. and 10:30 p.m., when police wreckers should have been available, all of the seized vehicles were towed by, and stored at, commercial towing-company yards.

Under New Mexico law,

10

> all garage owners and persons engaged in the business of towing automobiles, storing automobiles or furnishing wrecker service shall have a lien on all automobiles towed, stored or upon which wrecker service is performed when such towing, storage or wrecker service is furnished or performed at the request or with the consent of any person lawfully in possession of such automobile [including a peace officer who has requested towing], for the reasonable value of such services and for costs incurred in enforcing the lien.

N.M.S.A. 1978, § 48-3-19.  Beginning in September 2006, despite the state-court seizure order providing that the vehicles were to remain "in police custody" pending further court order, the tow companies began enforcing their statutory liens against the towed vehicles, selling them to themselves at "public auction" for the amount of the towing, storage, and administrative fees. *See* Doc. 124 at 5, ¶ 13; Doc. 123, Ex. 11-1 (Dugger's Services' lien on 2000 BMW 528 for $297.57; sold on 9/20/06 to Dugger's for amount of lien); *id.* Ex. 11-2 (Acme Towing lien on 2004 Lincoln Navigator for $210.27; sold to Acme on 9/6/06 for amount of lien); *id.* Ex. 11-3 (Acme Towing lien on 1995 Mercedes Benz S for $3,365.58; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-4 (Acme Towing lien on 1999 Volvo S80 for $3,305.58; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-5 (Acme Towing lien on 1995 Chevrolet K15 Suburban for $3,278.28; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-6 (Acme Towing lien on 1995 Suzuki Sidekick or $3,226.22; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-7 (Acme Towing lien on 1994 Cadillac for $3,624.06; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-8 (Acme Towing lien on 1993 Ford Santara Coachman RV for $3,206.43; sold to Acme on 10/10/07 for amount of lien).

Each of APD's "Tow-In Reports," a copy of which was given to the tow companies and one of which was supposed to be given to the vehicle's "owner," but none of which were given to Miller, had the box for "Hold on Car?" checked as "yes" and the "reason" given as either "embezzled vehicle," Doc. 151, Ex. 5 at 1; *id.* Ex. 4 at 5; "warrant," Doc. 151, Ex. 3 at 6; *id.* Ex. 7 at 5; or

"seizure," Doc. 151, Ex. 5 at 6, *id.* Ex. 6 at 5.  Barreras left a "return and inventory" with Virginia

Harris, who is Miller's mother, on October 19, 2006 stating that Barreras had executed a warrant

to seize the 2000 BMW on July 12, 2006 and further stating, "vehicle seized and is to remain at

Acme Towing 8705 Broadway until further orders are received by a district court judge."  Doc. 151,

Ex. 3 at 5.  As noted above, however, before Acme Towing sold the 2004 Lincoln Navigator to itself

in September 2006, it contacted Hammer seeking advice, but she told them she could not give them

legal advice and confirmed with the City that it would not pay for storage fees.  *See* Doc. 134, Ex.

13 at 3.  She also spoke with Ford Motor Credit during this time, which had a purchase-money lien

on the Lincoln Navigator, and told them that it was being held at Acme Towing.  *See id.*

On August 7, 2008, Miller pleaded "guilty" to one count of racketeering and to one count

of conspiracy to commit racketeering for his activities beginning with his hospital visits to Beale in

March 2006; and he pleaded "no contest" to one count of fraud involving $50,000 that he took from

Beale's accounts on April 19, 2006.  *See* Doc. 123, ¶¶ 9, 10 and Ex. 6 at 2 (Miller's admission in

support of the racketeering charges pertaining to January 2006 through July 2006, that he met with

Beale "at the hospital" and determined it would financially benefit him to gain access to her finances

and misappropriate them for his own use); Doc. 123, Ex. 3 at 1 (state-court "criminal charge

detail"); Doc. 141 at 5 (Miller's unrebutted statement that the fraud count to which he pleaded no

contest "involved one $50,000 transaction" of Beale's money occurring on April 19, 2006).  As part

of his plea, Miller agreed that he is "jointly and severally liable for all restitution" associated with

his convictions.  Doc. 123, Ex. 5 at 3.  His Plea Agreement referred to a "Stipulated Forfeiture

Agreement" regarding "the property obtained through fraudulent means and forfeiture pursuant to

the forfeiture provisions of the Racketeering statute . . . ."  Doc. 123, Ex. 5 at 3.  But it is undisputed

that Miller did not sign a separate forfeiture agreement, and none was attached to the Plea

12

Agreement. Thus, when the state-court judge approved the Plea Agreement on August 8, 2008, he also signed and entered a "Stipulated Order to Forfeit" that generally provided, *inter alia*, that "all vehicles purchased using money obtained using [sic] Roberta Beale's money" were forfeited "pursuant to the provisions of the Racketeering statute . . . ." Doc. 123, Ex. 7.

At the August 8, 2008 guilty-plea hearing, Hammer informed the court that Miller claimed he owned "a [seized] Mercedes, which he purchased prior to illegally obtaining Roberta Beale's money," and said that she had "informed [Miller] that if that were true, we would not forfeit that Mercedes." Doc. 134, Ex. 5 at 3. The judge repeated that the stipulated forfeiture order was only for "property that can be traced to Mrs. Beale." *Id.* at 4. Miller was supposed to submit documentation to Hammer to prove his claim, *see id.* at 3, and Miller's attorney states that he submitted a proposed order regarding specific vehicles to Hammer, but Hammer never responded to Miller's claim and no additional orders regarding any vehicles was ever entered. *See* Doc. 134, Ex. 4 at 2.

Of course, unbeknownst to Miller, Acme Towing had already sold the Mercedes to itself almost a year earlier, on October 10, 2007, so there was no way Hammer could return the Mercedes to Miller even if she agreed that it was purchased only with Miller's money - and not with money he obtained from Beale. *See* Doc. 134, Ex. 12 at 2 (Miller Affidavit); Doc. 123, Ex. 11- 3. Miller later attempted to withdraw his guilty plea at his sentencing hearing in November 2008, in part because the vehicles he contended were purchased with money that had not belonged to Beale and should not be forfeited had already been sold by the tow yards where they had been stored. *See* Doc. 134, Ex. 21 at 3, 5-6 (transcript of state-court sentencing hearing). Miller obliquely mentioned only the Lincoln Navigator at that hearing. *See id.* at 3. He also complained that, because the cars that *could have been* forfeited had already been sold by the tow yards, who kept the proceeds, amounts

13

that *could have been* obtained from their sale could not be applied to the restitution amount he owed to Beale. *See id.* at 5-6. The state-court judge denied Miller's request to withdraw his guilty plea and told Miller he would have to take up the issue regarding the unauthorized sale of the vehicles "post sentencing." *Id.* at 6. The State's expert testified at sentencing that the amount of restitution due to Beale was $605,836.07. *See* Doc. 142, Att. 1 at 10 (Miller's amended state appellate brief-in-chief). Miller's Judgment and Sentence ordered restitution to all victims in both of Miller's criminal cases that were settled by the Plea Agreement in the amount of $733,570. *See id.* Miller has appealed from the order denying his request to withdraw his guilty plea.

## DISCUSSION

Miller contends that his constitutional right to due-process was violated when the City, Barreras, Hammer, and Drebing caused eight of the vehicles[4] he owned to be seized and towed to private tow yards in violation of the state-court's orders, and then failed to follow proper procedure and permitted them to be sold by those tow yards before his conviction, without due process, and without any of the money from the sale of the vehicles being applied to the restitution amount he owes to Beale.

## I.      Standing.

Because it is a component of subject-matter jurisdiction, which the Court should always address before getting to the merits of a claim, the Court will first address the Defendants' argument that Miller "lacks standing to claim any violation of due-process rights afforded under the New Mexico Forfeiture Act . . . ." Doc. 124 at 12 (City Defendants' Motion for Summary Judgment);

---

[4] Miller concedes that one of the nine vehicles that he included in his Amended Complaint, a 2001 Cadillac DeVille, "was not seized by the [APD]" and that, therefore, he has no claim related to this vehicle. Doc. 141 at 6.

14

Doc. 123 at 1, 22 (DA Defendants' motion for summary judgment contending that, because Miller is not a statutory beneficiary under the Racketeering Act to proceeds from the property that he forfeited by stipulation, the Defendants failure to initiate a complaint for forfeiture under the Forfeiture Act "had no effect on any property interest held by Plaintiff and Plaintiff has no standing to complain of any purported statutory violation").

"Standing is determined as of the time the action is brought."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).  For an individual to have standing to bring suit in federal court,

> [f]irst, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between that injury and the challenged action of the defendant-the injury must be "fairly traceable" to the defendant, and not the result of the independent action of some third party.  Finally, it must be likely, not merely speculative, that a favorable judgment will redress the plaintiff's injury.

*Id.*

As discussed above, it is undisputed that, at the time the eight vehicles were seized and sold, Miller held legal title to them because his guilt had not been established; he had not agreed to forfeit vehicles that could be traced to Beale's money; and no forfeiture order had been entered.  He, therefore, had a property interest in the seized vehicles that could not be taken without constitutional due process.  *See Sandia v. Rivera*, 132 N.M. 201, 203, 46 P.3d 108, 110 (Ct. App. 2002) (holding that owner of lawfully-towed vehicle "had a protected property interest that the state cannot limit without procedural due process").  Further, it is undisputed that, before Miller agreed to forfeiture of most of the seized vehicles, there was a dispute regarding the nature of the funds used to purchase the Mercedes such that the Order to Forfeit limited the vehicles to those purchased with money that could be traced to Beale.  And even *after* he agreed that vehicles that could be traced to Beale should

15

be forfeited, Miller had a statutorily-protected property interest in the credit he would receive on forfeited vehicles towards his liability for restitution. *See* N.M.S.A. 1978 § 31-27-7 (providing that, after forfeiture, "all sale proceeds of the sale of forfeited property shall be distributed [] first, to pay reasonable expenses incurred for storage, protection and sale of the property; second, any remaining balance to pay restitution to or on behalf of victims, if any, of the crime related to the forfeiture"). Miller has alleged injury in fact by the unauthorized retention, storage, and sale of the vehicles to which he held legal title. He has alleged a causal connection between the injury and the actions and inactions of the DA Defendants and Officers because they set the series of events in motion and refused to release, or to obtain an order releasing, the vehicles within thirty days of their seizure. It is likely that a favorable judgment will redress his injury. He, therefore, has standing to bring his claims.

## II.     Waiver.

The Defendants also argue that, even if he has standing, Miller waived his due-process rights by agreeing to the Stipulated Order to Forfeit. The Court disagrees. First, as a matter of law, Miller did not waive any due-process rights regarding the Mercedes by agreeing to the Stipulated Order to Forfeit because he has, from the beginning, contended that he purchased it with funds that cannot be traced to Beale, and the Order to Forfeit specifically applies only to vehicles whose purchase can be traced to Beale's money. Second, Miller agreed only to a *statutory* forfeiture that would result in him being given credit for restitution under the State's Forfeiture Act; he did not agree to the unauthorized custodial placement of the vehicles with tow companies that sold them without a court order.

As noted, under the Forfeiture Act and APD policy, Hammer, Drebing, and Barreras had a duty to ensure the return of the seized vehicles to Miller within three, or twenty, or no more than

thirty, days of their seizure because neither the DAs nor the City's SID filed a complaint for forfeiture.  But Hammer has posited (and the City relies on her proposition, *see* Doc. 124 at 8, ¶ 17 and Doc. 149 at 12), that the Forfeiture Act does not even apply to the seized vehicles because she never filed a complaint for forfeiture under the Act and the vehicles were seized as "evidence." Doc. 134, Ex. 45 at 10 ("I am not aware of any requirement under New Mexico . . . law to follow any of these provisions [of the Forfeiture Act] if a criminal defendant agrees to forfeit property pursuant to a Plea . . . . If property is seized by law enforcement as evidence in a criminal matter, the New Mexico Forfeiture Act plays no role regarding disposal of property seized as evidence."); *see* Doc. 142 at 12 (contending that "the DA Defendants had no duties under the Forfeiture Act"). But the New Mexico Courts have soundly rejected those propositions.  As noted above, one of the express purposes of the Forfeiture Act is to "to protect the constitutional rights of persons accused of a crime" in regard to property that has been taken from them during a criminal investigation. N.M.S.A. 1978 § 31-27-2.

> The [Forfeiture Act] does not require a forfeiture action to be filed to make it operative.  In fact, [one section of] the statute is entitled, "Safekeeping of seized property pending disposition [,]" which plainly indicates that compliance is required regardless of whether a forfeiture complaint is ultimately filed.

*Albin v. Bakas*, 141 N.M. 742, 746, 160 P.3d 923, 927 (Ct. App. 2007).  Clearly, the DA Defendants had a duty under the Forfeiture Act to return the vehicles to Miller within 30 days of their seizure because they did not file a complaint for forfeiture in his criminal proceeding.

Further, as noted above, if the vehicles were being held only for evidentiary purposes, APD policy required their release to Miller or other legal owners within three days of their seizure.  The Defendants point to nothing, and the Court has found nothing in the record or state law cited by the parties, that authorized the APD Officers to have the vehicles towed to private yards for indefinite

storage for evidentiary purposes or for Officer Barreras and the DA Defendants to leave them there. In fact, placing and leaving the vehicles in the custody and control of the private tow companies violated the seizure order's *express* requirement that the vehicles were to be "towed and to remain *in police custody* until released by a District Court Judge."  Doc. 134, Ex. 9 at 1, 3 (italics added).

The state-court's seizure order, New Mexico's Forfeiture statute, and the City's internal policies regarding vehicles seized by law-enforcement officers establish the amount and type of process that was due Miller.  He did not lose his property interest in the credit he was to receive for restitution or waive his constitutional or statutory right to due process by *hypothetically* agreeing (after the vehicles had *already* been sold without his knowledge), that certain vehicles *could have been* forfeited under the Forfeiture Act.

The Court emphasizes that it is expressing no opinion regarding whether the vehicles' unauthorized sales by the tow companies may be equated to forfeiture for double-jeopardy purposes under New Mexico state law.  That is a question that will be answered by the state appellate court and that is irrelevant to the due-process issues before this Court.

## III.  The City's liability.

The City contends that Miller "does not allege that a constitutional deprivation is due to an established municipal policy, custom or procedure," Doc. 124 at 10, and that it cannot be held liable under § 1983 for "random unauthorized action" of its agents.  Doc. 149 at 2.  The Court agrees.  A § 1983 civil-rights action against an employer-entity may not be based solely on a theory of *respondeat-superior* liability for the actions of employees.  *See Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  Where the plaintiff alleges that he or she "has suffered a deprivation of federal rights at the hands of a municipal employee[,]" and *not* that the municipal action itself violated the law, "rigorous standards of culpability and causation must be applied to ensure that the

municipality is not held liable solely for the actions of its employee." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 406 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights." *Id*. at 404. "Since *Monell*, the Supreme Court . . . nonetheless has imposed liability upon municipalities when the enforcement of their policies or customs by their employees causes a deprivation of a person's federally protected rights." *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010); *and see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (stating, "a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation; thus . . . the entity's 'policy or custom' must have played a part in the violation of federal law") (internal quotation marks and citations omitted). Here, Miller has established that Barreras acted *contrary* to the warrants and to APD policy by having the vehicles towed to, and stored at, private tow yards for more than three days without issuing a release, and that she never released the vehicles to Miller. There are no other allegations in Miller's Amended Complaint that could give rise to the City's liability. The Court concludes that Miller's § 1983 due-process claims against the City must be dismissed.

But Miller has also alleged that the City and its agents/employees are liable to him for violation of his property and constitutional rights under the New Mexico Tort Claims Act ("NMTCA"). Under New Mexico law, "[a] governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived" and the doctrine of *respondeat superior* extends liability to those entities with supervisory control over the tortious actors. *Silva v. State*, 106 N.M. 472, 477, 745 P.2d 380, 385 (1987). "Accordingly, absent a claim that the officers were acting outside the scope of their authority, the Police Department may be held vicariously liable for any alleged torts committed by the officers for which immunity has

19

been waived." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 121 N.M. 646, 651, 916 P.2d 1313, 1318 (1996).

N.M.S.A. 1978, § 41-4-12, which sets out the exceptions to immunity in the NMTCA regarding law-enforcement officers, provides

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

New Mexico Courts have held that a law-enforcement officer need not personally commit an enumerated tort for the officer's conduct to come within the waiver of Section 41–4–12. *See Methola v. County of Eddy*, 95 N.M. 329, 333, 622 P.2d 234, 238 (1980) (concluding that "the Legislature intended 'caused by' in Section 41–4–12 to include those acts enumerated in that section which were caused by the negligence of law enforcement officers while acting within the scope of their duties"); *Schear v. Bd. of County Comm'rs*, 101 N.M. 671, 673, 687 P.2d 728, 730 (1984) (holding that the NMTCA waived immunity where citizen was attacked after sheriff's officers negligently failed to respond to an emergency call because "law enforcement officers need not be the direct cause of injury (in the sense of having inflicted it) in order for liability to attach"). Under the NMTCA, the City remains liable both for constitutional violations and for "violations of property rights" caused by its officers.

## IV. Liability of the APD Officers and the DA Defendants.

The City and the DA Defendants contend that the individual Defendants are entitled to qualified immunity on Miller's constitutional claims because he "failed to demonstrate that [their] actions violated his statutory or constitutional rights." Doc. 124 at 12; *see* Doc. 142 at 2.

"In resolving a motion to dismiss based on qualified immunity, a court must consider whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Leverington v. City of Colorado Springs,* 643 F.3d 719, 732 (10th Cir. 2011) (quotations and ellipses omitted).

. . . .

Whether a right is "clearly established" is an objective test: "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Stearns v. Clarkson,* 615 F.3d 1278, 1282 (10th Cir. 2010) (quotation omitted). "In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quotation omitted).

*Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

"When government action deprives a person of life, liberty, or property without fair procedures, it violates procedural due process." *United States v. Deters*, 143 F.3d 577, 582 (10th Cir. 1998). Although "[d]ue process is flexible and calls [only] for such procedural protections as the particular situation demands," the Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks and brackets omitted). Here, the undisputed facts show that Miller was permanently deprived of the ownership of the seized vehicles before any hearing of any kind was held. As noted, *supra*, Miller contends that Barreras, Hammer, and Drebing took actions - calling private tow yards to take and/or continue to store the vehicles and then failing or refusing to authorize their release or to give them back to him - that directly resulted in his property being sold without compensation to Miller and without any hearing whatsoever.

### A.    The City relies on inapplicable legal authority regarding waiver.

The Court has already rejected the Defendants' contentions that Miller lacks standing to

bring suit or waived his constitutional rights by agreeing to the stipulated order of forfeiture *after* the vehicles had already been sold contrary to the state-court's seizure order. The Court further rejects the City's argument that the reasoning of *United States v. Grover*, which is based on waiver, should control the resolution of this case. In *Grover*, after entering into a plea agreement, the government and the defendant executed a separate "Forfeiture Agreement" in 1988, in which the defendant agreed to sell one of his residences, to turn over a portion of the sales proceeds to the government, and "not to contest the forfeiture" of those proceeds in exchange for the government agreeing "not to seek forfeiture of other property." 119 F.3d 850, at 851 (10th Cir. 1997). A year later, the defendant's attorney sent a check for the agreed amount to the government, and they executed "a document entitled 'Satisfaction of Forfeiture Agreement.'" *Id.* The government did not thereafter initiate federal forfeiture proceedings, and the defendant filed suit in 1996 under a federal statute for return of the money that had been sent to the government, arguing that "because the five-year statute of limitations on the civil forfeiture had run, the government was no longer entitled to keep the money" and "legal ownership of the property was never transferred to the government." *Id.* at 851-52. The Tenth Circuit held that, "[b]y the terms of the Forfeiture Agreement, under which he has already received the full benefit of his bargain, [the defendant] relinquished any possessory claim he had to the property. That the agreement still required the government to act in order to secure legal title does not change this fact." *Id.* at 852. The Court also noted that, "[i]n the Forfeiture Agreement, [the defendant] agreed not to contest the forfeiture. Thus, he agreed not to contest the government's efforts to complete the transfer of legal title to the property, and, necessarily, not to contest the government's possession of the property." *Id.* The facts in the *Grover* case are so easily distinguishable from the undisputed facts in this case that the Court need not expend much ink explaining why it is not controlling precedent. Suffice it to say that Miller's cause

22

of action is totally different and is based on violation of due process; no court-sanctioned forfeiture occurred in his case; Miller never executed a separate forfeiture agreement in which he waived a right to challenge due process or gave up his right to receive credit for restitution; and Miller did *not* receive part of the benefit of his bargain by agreeing that the vehicles could be forfeited because no proceeds were ever applied to his liability for restitution.

**B. The City relies on inapplicable cases regarding plea agreements.**

The Ohio cases the City cites for the proposition that, if "a defendant enters into a plea agreement, and clearly has notice of and agrees to the forfeiture of his property, the procedural requirements of the forfeiture act need not be followed in order to comport with due process" are also factually distinguishable because here, it is undisputed that Miller clearly *did not* have notice that the vehicles had already been sold and that he no longer held legal title to them. Thus, on the undisputed facts in this case, the Court concludes that any *oral* agreement that Miller made to forfeit the seized vehicles after they had already been sold but *before* he knew of their sale is not enforceable to preclude him from bringing suit for violation of his due-process rights.[5]

**C. Miller has established a property interest in all of the vehicles.**

Alternatively, the City and the DA Defendants argue that the APD Officers, Hammer, and Drebing are entitled to summary judgment on the issue of qualified immunity because Miller cannot "establish a property interest in three of the nine vehicles" and, therefore, cannot establish a procedural-due-process violation. Doc. 124 at 15; *see* Doc. 123 at 18.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due

---

[5] This does not mean, however, that his plea agreement was invalid as a matter of law or that the Order to Forfeit is invalid or void. Those are issues that the state courts will address in Miller's direct appeal.

Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quotations omitted). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 333, 96 S. Ct. 893 (quotation and brackets omitted).

We have held that, "[t]o assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011).

*Brown*, 662 F.3d at 1167.

"To have a property interest in a benefit, a person . . . must [] have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Such entitlements are, " 'of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' "

*Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

In support of its contention that Miller did not legally own, and therefore had no property interest in, either the 1995 Suzuki Sidekick or the 1994 Cadillac Seville when they were sold, the Defendants proffered only a copy of the liens and affidavits of resale that Acme Towing filed with the MVD indicating that Mary Mochan was the "registered owner" of the Sidekick and that Thomas and/or Monica Brady were the registered owners of the Seville. *See* Doc. 124 at 15, 8; *see* Doc. 123, Exs. 11-6, 11-7. Of course, these documents are not copies of the actual titles, and thus do not establish legal ownership, and the City's position is contrary its own Officer Barreras's sworn affidavits submitted to the state court. Those affidavits state that both the Sidekick and the Seville "have been purchased by Andrew J. Miller and have his name on the registration form according to known police sources." *See* Doc. 151 Ex. 1 at 2; Doc. 134, Ex. 8 at 2.

In response to the motion for summary judgment, Miller has submitted copies of dealers'

bills of sale and of the legal titles showing that he purchased both of these vehicles from dealers who had obtained them from other dealers after Mochan and the Bradys traded them in, although he admits that he had not yet registered them when they were seized.  *See* Doc. 134, Exs. 34, 35, 36, and 36b.  Miller has established that he held legal title to the 1995 Suzuki Sidekick and the 1994 Cadillac Seville at the time they were seized, towed, stored, and sold, and has thus established a property interest in those vehicles at the time of the alleged constitutional violation.

### D. Miller's property interests were enforceable at the time of the due-process violation.

The Defendants next argue that, although he may have held legal title to the seized vehicles, Miller has no "enforceable property interest" in any of them because he acquired them "with misappropriated money" and the "doctrine of constructive trust defeats any claim of property interest."  Doc. 124 at 15-16; *see* Doc. 123 at 19-21.  As discussed below, the Court fully intends to impose the doctrine of constructive trust to return to Ms. Beale any money that Miller may recover in this suit as damages for the unauthorized sale of the vehicles to which he held legal title but that were purchased at least in part from money he unlawfully took from her.  Nevertheless, it is undisputed that, at the time Officer Barreras placed the vehicles in the custody of third parties in contravention of the seizure warrant; at the time she and the DA Defendants failed or refused to release them to Miller after they had been processed either as evidence or as potential forfeiture property as required by APD policy; and at the time they were sold in contravention of the seizure warrants, Miller's guilt had not been adjudicated and no court had yet determined that the vehicles were purchased with stolen money or that Miller had a duty to convey the vehicles to Beale.  Thus *at the time of the constitutional violation*, Miller still held valid legal title to the vehicles.  He, therefore, had an enforceable property interest in the vehicles to which he was entitled to due process before they were permanently taken from him.  The fact that Miller's guilt of committing

25

fraud and racketeering was established in August 2008 by admission does not mean that his due-process rights were never violated in 2006 and 2007. And because no court has yet determined which vehicles were purchased with funds that can be traced to Ms. Beale, there has not yet been a judicial determination regarding the scope of a constructive trust.

### E. Miller has demonstrated clearly-established constitutional due-process violations.

The City next contends that its Officers are entitled to qualified immunity because Miller's constitutional claims "refer only to non-compliance with state law," in regard to the process that was due to him, citing a 1994 case from the Third Circuit. Doc. 124 at 18-19. Again, that case is easily distinguishable because it involved an actual voluntary forfeiture of property that the plaintiff still possessed and because the plaintiff there claimed only that "his procedural due process rights were violated in the forfeiture negotiations" as "established under New Jersey law governing civil forfeiture." *Giuffre v. Bissell*, 31 F.3d 1241, 1257-58 (3rd Cir. 1994). Here, Miller contends that Officer Barreras placed his vehicles, and allowed them to continue to be held, in the custody of private parties who disposed of the property without compensation to Miller in violation of a court order and without proper notice and a hearing, which violated his *constitutional* right to due process. *See Sandia v. Rivera*, 132 N.M. 201, 204, 46 P.3d 108, 111 (Ct. App. 2002) (holding that "the government can properly tow a private vehicle before notice and hearing. But the government must provide a hearing to allow the vehicle's owner an opportunity to timely challenge the legality of the towing. Without notice and a meaningful and timely hearing, the towing and continued deprivation of use of the vehicle is a deprivation of property without due process of law.") (citation omitted). It is true that

> "[a] violation of state law does not by itself constitute a violation of the Federal Constitution." *Nordlinger v. Hahn*, 505 U.S. 1, 26, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). To the extent, however, that state law creates an interest substantial

enough to rise to the level of a "legitimate claim of entitlement," that interest is protected by the Due Process Clause of the Fifth Amendment. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," U.S. Const. amdt. XIV, § 1; *accord* amdt. V, and thus "imposes procedural limitations on a State's power to take away protected entitlements." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, —— U.S. ——, 129 S. Ct. 2308, 2319, 174 L. Ed. 2d 38 (2009).

*Pavatt v. Jones*, 627 F.3d 1336, 1341 (10th Cir. 2010). As noted, *supra*, Miller had a protected property interest in the vehicles to which he held title. The state-court's order, and the provisions of the State Forfeiture Act and Racketeering Act gave Miller a legitimate expectation that the seized property would either be returned to him within thirty days or that, if he was found guilty *and* either agreed to forfeiture or the DA or the City of Albuquerque had filed a forfeiture proceeding, he would be given credit for restitution after the vehicles that were traced to his racketeering and fraud convictions were sold. The Constitution guaranteed notice and some type of hearing before the vehicles were permanently taken from him.

Because his property was permanently disposed of without compensation or other benefit to Miller and without the process to which he was entitled under the circumstances, Miller has alleged a constitutional violation of procedural due process that has long been recognized in New Mexico and in the Tenth Circuit. *See  Coleman v. Turpen*, 697 F.2d 1341 (10th Cir. 1982)[6].

In *Coleman*, the plaintiff sued "a sheriff, a prosecutor, and an automobile wrecking company" under § 1983 and for conversion, alleging "that the defendants, acting under color of state law, deprived him of property without due process in violation of the fourteenth amendment." *Id.* at 1343.

---

[6] It surprises and concerns the Court that none of the Defendants mentioned or cited *Coleman*, which is controlling precedent.

> . . . . Mr. Coleman was arrested and charged with murder.  In connection with his arrest, the Muskogee, Oklahoma Sheriff's Department seized a truck and camper worth $8,000, two boxes of tools worth $500, and $210 cash.  Nothing in the pleadings indicates that the property was stolen or contraband.  The Sheriff's Department hired defendant Kiefer Wrecker Service to tow and store the camper, and incurred a substantial storage bill without Mr. Coleman's consent.
>
> Mr. Coleman was convicted of murder and sentenced to death.  At the criminal trial, the State introduced photos of Mr. Coleman's camper and tools, but none of the property itself, as evidence.  At some time in the course of or following the trial, Kiefer sold the $8,000 camper for a mere $600 to satisfy the Sheriff Department's storage bill.  Kiefer made the sale without notifying Mr. Coleman, who was in custody and did not know where his property was.  Mr. Coleman appears to allege that Kiefer converted his tools as well.

*Id.*  As here, "[a]fter his conviction, Mr. Coleman tried unsuccessfully to recover his property" but Kiefer had already sold the camper and tools.  *See id.*  The Tenth Circuit held that "the defendants may be held liable [under § 1983] unless they are protected by immunity from suits for damages."  *Id.*  The Tenth Circuit held that "the sale deprived Mr. Coleman of property" and "was an integral part of the deprivation: it transformed a temporary seizure into a permanent divestment."  *Id.* at 1345.

> Kiefer jointly participated in seizing the truck by towing it away.  Since the State has asserted a right to maintain possession of the camper, Kiefer held the truck for the State, not for Mr. Coleman.  In allowing Kiefer to sell the camper, the State thus deprived Mr. Coleman of his property in joint participation with Kiefer.  We hold that Kiefer's sale of the camper was state action under the fourteenth amendment and was therefore under color of state law for purposes of section 1983.

*Id.*  The Tenth Circuit further held that "the sheriff's immunity for his conduct leading to a deprivation of the tools and camper is only qualified.  Of course, he cannot show his reasonableness in allowing property to be sold by pointing to a statute that requires him to retain it."  *Id.* (citation omitted).  Miller has satisfied both prongs of the qualified-analysis predicate.

**F.  The individual Defendants directly participated in the constitutional violations by ordering towing and storage by private parties, by refusing to return the vehicles, and then**

**by refusing to prevent, or acquiescing in, the permanent deprivation.**

Finally, the Defendants argue that Miller's claims for violation of procedural due process fail because the individual Defendants "did not personally participate in the forfeiture of Plaintiff's vehicles."  Doc. 124 at 20-21; *see* Doc. 123 at 22 (contending that the DA Defendants "were not involved in the towing, liens, notices or sale of these vehicles").  They assert that Miller's claims fail because the tow companies, and not the individual Defendants, actually sold the vehicles; that Officer Barreras didn't know that Miller's attorneys inquired into "the status of these vehicles;" and that, therefore, they "are not liable for any constitutional deprivations."  Doc. 124 at 21.

As to Officer Barreras, Hammer, and Drebing, the Court disagrees.  While "there must be cause in fact between the conduct complained of and the constitutional deprivation,"

> [f]or liability under section 1983, direct participation is not necessary.  Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable.  The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.

*Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990); *see Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir.  2010) (concluding that the standard for supervisory liability set forth in *Iqbal* is consistent with much of the Tenth Circuit's prior precedent and that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .'").  *And see Coleman*, 697 F.2d at 1345 (holding that plaintiff "stated a cause of action against all three defendants for the deprivation of his tools and camper" that were sold by the private tow company); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008) (holding that the APD Captain who "played

29

a role in developing the APD's plan for the protest and acted as the incident commander in charge

of the police response," and gave orders for other officers to arrest and remove citizens was a proper

defendant because he had a causal connection to the constitutional violations); *Sandia*, 132 N.M.

at 203, 46 P.3d at 110 (rejecting argument that "state action ended when the truck was towed, thus

[officer who ordered towing] had no duty to provide notice of anything . . . [because] [t]he tow order

initiated the immediate deprivation of the vehicle and that deprivation continued with the [tow

company's] fee requirement for the vehicle's release, implicating the right to due process no less

than the initial towing").

   It seems clear that officers and DAs who give possession and absolute and indefinite control

of property to a third party – contrary to court order – by using their police powers, and then refuse

to release the property to a defendant and leave it with the third party to do as it pleases,

notwithstanding constitutional protections, specific statutes, and APD policy directives to the

contrary, may be held liable for the permanent taking of that property without due process or

compensation. As noted, the state-court's seizure order required Officer Barreras and the DAs to

ensure that Miller's vehicle's were retained in police custody. APD policy required Barreras to

release the vehicles to Miller within three days. The Forfeiture Act required Hammer and Drebing

to give the vehicles back to Miller within 30 days of their seizure. But because none of them ever

authorized the release of the vehicles to Miller, the tow companies, which were still holding the

vehicles on behalf of the state - and not on behalf of Miller - unlawfully sold them. *Cf. Dopp v.

Loring*, No. 05-5057, 245 Fed. App'x 842, *846, 2007 WL 2452683, **3 (10th Cir. Nov. 30, 2007)

(noting that, under *Coleman*, the sale of a  of a vehicle by a tow company is "chargeable to the

State" when the vehicle has not been released to its owner by the officer who ordered it towed

because after release, the vehicle is being held for the owner). Under *Coleman* and *Dodds*, Officer

Barreras, Hammer, and Drebing do not have qualified immunity in this case because they violated Miller's constitutional rights that were clearly established.

On these same undisputed facts, however, it appears that Defendant Officer Kevin Rowe is entitled to summary judgment on Miller's claims against him. In support of his contention that Rowe participated in the deprivation, Miller points only to two "offense report[s]" that Barreras prepared. *See* Doc. 141 at 5. Rowe simply signed off on the reports as a "reviewing officer." *See* Doc. 134, Exs. 10, 14. Reviewing and signing this report, as a matter of law, is not sufficient to show that Rowe either directly participated in the deprivation or that he set in motion the series of events that resulted in the deprivation.

### G. No adequate post-deprivation remedies were available to Miller.

The City also argues that it is entitled to summary judgment because (I) the "Plaintiff fails to allege there were inadequate post-deprivation remedies or that he exhausted any such remedies before filing the instant lawsuit," and (ii) insofar as Miller is contending that the pre-deprivation remedies were "inadequate," because the taking of Miller's property was a "random and unauthorized act," Miller was not entitled to a pre-deprivation hearing "as long as the state provides adequate post-deprivation remedies." Doc. 149 at 2, 7-8. But Miller is not complaining about pre-deprivation remedies being merely inadequate - he is complaining that Barreras, Hammer, and Drebing allowed his property to be sold with no due process of any kind and without following the statutorily established pre-deprivation procedures that *would have been adequate* to protect his interests had they been followed. The City ignores the pre-deprivation hearings required by the Forfeiture Act and does not point to a single post-deprivation remedy available to Miller that would provide monetary damages for violation of his civil rights. Instead, it argues that Miller is now obtaining adequate post-deprivation remedies through the appeal from the denial of his motion to

withdraw his plea agreement.  *See* Doc. 149 at 8-9.

The DA Defendants also contend that a post-deprivation common-law or statutory action for conversion against the tow companies and Miller's criminal appeal are adequate remedies.  *See* Doc. 142 at 13.  Miller's appeal, however, will not address monetary damages caused by an alleged civil-rights violation; it simply raises the issues whether the plea agreement must be withdrawn and/or whether the sale of the vehicles prior to Miller's conviction constituted double jeopardy such that the State could not impose additional punishment for Miller's actions.  *See* Doc. 142, Att. 1 (excerpts from Miller's amended state appellate brief-in-chief).  Moreover, courts have expressly rejected the DA Defendants' proposition that actions for replevin or conversion are adequate remedies for due-process violations.  *See Sandia*, 132 N.M. at 205, 46 P.3d at 112 (rejecting officer's contention that "the availability of [] an action [for replevin] [] satisfies due process. . . . A replevin action against [the tow company] would not remedy the deprivation of property without due process.  Due process is required upon towing, not sometime later in a replevin action.  Furthermore, it is the government that caused the towing company to take action.").

As the New Mexico Court of Appeals noted in *Sandia*,

> While Sandia might sue Rivera under § 1983 claiming that her vehicle had been illegally towed, *see Weinrauch*, 751 F.2d at 359, or sue in conversion, *see Stypmann*, 557 F.2d at 1343–44 n. 19, such civil actions may entail considerable delay and do not adequately alleviate the immediate due process concern.  Due process requires prompt notice with "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333, 96 S. Ct. 893 (internal quotation marks and citation omitted).  A hearing months or more down the road does not prevent wrongful detention; rather, it prolongs wrongful detention.  By the time a hearing is held, the vehicle may be sold for the owner's failure to timely pay the fees required.  That other remedies may be available does not remove the need for a statutory post-deprivation hearing requirement.

*Id.* at 205, 46 P.3d at 112.

This is not a prisoner suit against prison officials that requires exhaustion of prison

administrative remedies, and "it is more than well-settled that a plaintiff under 42 U.S.C. § 1983 need not exhaust his administrative remedies before filing suit in federal court." *Hopkins v. Okla. Pub. Emp. Ret. Sys.*, 150 F.3d 1155, 1160 (10th Cir. 1998).

**H.  Miller has stated a claim against Hammer and Drebing.**

Besides the arguments addressed above, the DA Defendants also contend that Miller's allegations are too conclusory to state a claim against them, asserting that Miller has not demonstrated that obtaining the warrants was "illegal or improper." Doc. 123 at 12.  But, as the DA Defendants concede, and the Court has previously noted, Miller does not challenge the validity of the warrants.  He challenges the DA Defendants' direct participation in setting in motion a series of events - the taking of the seized vehicles to private tow yards, their subsequent intentional refusal to return the vehicles to Miller within 30 days, and their acquiescence or indifference to the sale of the vehicles without due process. *See Dodds*, 614 F.3d at 1199 ("§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution . . . .'"); *Poolaw v. Marcantel*, 565 F.3d 721, 733 (10th Cir. 2009) (noting that supervisors may be held liable under § 1983 if they "set in motion a series of events they knew or reasonably should have known would result [in a constitutional violation]"); *see also Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1263–64 (D. Colo. 2010) ("The exercise of control which may create the 'affirmative link' does not need to be the sort of on-the-ground, moment-to-moment control that defendants appear to suggest.  Rather, the establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's 'affirmative link' to the constitutional violation. . . . [W]here an official with policymaking authority

33

creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application.") (quoted with approval in *Dodds*, 614 F.3d at 1199).

### I. Absolute prosecutorial immunity.

The Court agrees that the DA Defendants are entitled to absolute prosecutorial immunity for their part in obtaining orders freezing Miller's bank accounts and for allegedly "extort[ing Miller] with a plea he could not refuse" Am. Compl. ¶ 46, because both actions are prosecutorial duties "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976); *Ferrer v. Dailey*, No. 96-3155, 104 F.3d 367, 1996 WL 731618, *1 (10th Cir. Nov. 30, 1996) (unpublished) (holding that "prosecutors would be protected by absolute prosecutorial immunity for their actions in negotiating the plea and an in rem forfeiture agreement"). Of course, the DA Defendants are not absolutely immune from liability for their roles in acquiescing to the sales of Miller's vehicles or in continuing to refuse to release Miller's bank account #8511, which is not the subject of any forfeiture order or plea agreement.  In *Coleman*, the Tenth Circuit held that, "in managing the post-trial disposition of seized property not used as evidence that the State did not intend to keep—as evidenced by its acquiescence in the sale—[the prosecutor] was acting as an administrator, not as an advocate" and therefore was not entitled to absolute prosecutorial immunity.

> A prosecutor's knowledge that he may be liable if he participates in the illegal sale of seized property will not make him hesitate to initiate a case or introduce seized property as evidence. . . . [The prosecutor] has only a qualified immunity for his conduct relating to the converted tools and camper.  This immunity does not shield him from liability for a deprivation of the tools and camper if he should reasonably have known that the sale violated Mr. Coleman's constitutional rights.

697 F.2d at 1346.

34

**J.  Timeliness of response.**

Finally, the City argues that the Court should grant summary judgment in the Defendants'
favor because "Plaintiff served his Response [9 days] beyond the agreed upon extension of the
parties."  Doc. 149 at 2.  The Court rejects these arguments.  Miller attached a letter to his Response
stating that he was unable to timely mail it for filing because of "a recent change" in the DOC's
legal-mail policy that does not allow inmates to "send out legal-size envelopes [] without
prepayment."  Doc. 141 at 1.  The Court will excuse his tardy filing; but in any event, it would not
grant summary judgment in favor of the City merely because the response was not timely filed.  *See*
*Reed v. Bennett*, 312 F.3d 1190, 1196 (10th Cir. 2002) (holding that plaintiff's failure "to file a
response within the time specified by the local rule . . . did not relieve the court of its duty to make
the specific determinations required by FED.R.CIV.P. 56(c)" because it is the movant that must show
it is "entitled to judgment as a matter of law"); *id.* at 1195 (noting that "dismissal or other final
disposition of a party's claim is a severe sanction reserved for the extreme case, and is only
appropriate where a lesser sanction would not serve the ends of justice").

## V.  Abstention is not proper in this case regarding the due-process or conversion claims.

In their reply brief, the City Defendants suggest that the Court "may abstain from deciding
the instant lawsuit until the resolution of Plaintiff's criminal appeal."  Doc. 149 at 9.  This Court
generally need not abstain while Miller's criminal appeal is pending because the appeal will not
resolve the constitutional issues present in this case.  As the City Defendants note, the abstention
doctrine "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a
controversy properly before it," *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 813
(1976), and the City points to no exceptions in regard to the constitutional issues.

## VI. The *Younger* abstention doctrine bars the relief Miller requests regarding his frozen bank

35

**account.**

Although not raised by the parties, the Court notes that Miller appears to seek declaratory or injunctive relief regarding a Bank of the West account ending in 8511, which was  frozen by order of a state-court judge in regard to Miller's criminal case.  *See* Am. Compl. at 8-9; Doc. 134 at 4 (complaining that the Bank of the West "will not release the funds on deposit there without a court order"); Doc. 142, Att. 1 at 26-27 (copy of state-court order submitted by Drebing and signed and filed August 9, 2007, ordering that the Bank of the West "shall freeze the ACCOUNT NUMBER #274048511 belonging to ANDREW MILLER and/or DYNASTY PRODUCTION MANAGEMENT, and shall be prohibited from allowing any withdraws [sic] or transfers of any funds through any method from this account.").

> Absent unusual circumstances, a federal court is not permitted to intervene in ongoing state criminal proceedings.  *Younger v. Harris*, 401 U.S. 37, 54, 91 S. Ct. 746 (1971).  The notion that state courts should remain free from federal court intervention derives from the limited nature of equity jurisdiction and the belief that our federal system operates most effectively when the states and their political subdivisions are left alone.  *Id*. at 43–44.  As a result, under *Younger* and its progeny, federal courts should not interrupt ongoing state criminal proceedings when adequate state relief is available.  *Joseph A. v. Ingram*, 275 F.3d 1253, 1267 (10th Cir. 2002).  More specifically, federal courts must abstain pursuant to *Younger* when: "(1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1215 (10th Cir.2003) . . . . If these three conditions exist, absent extraordinary circumstances, abstention is mandatory.

*Walck v. Edmondson*, 472 F.3d 1227, 1232-33 (10th Cir. 2007).

Because his criminal appeal is still pending, Miller's criminal proceedings are ongoing.  The state court may provide an adequate forum to hear Miller's claims regarding whether this bank account should be unfrozen (and, if she seeks to intervene, Beale's claim that the proceeds in the

account should be given to her as restitution); and the state criminal proceedings involve important state interests regarding restitution matters that look to state law for their resolution. The Court must abstain from entertaining Miller's claim for declaratory and injunctive relief against Hammer and Drebing in their official capacities regarding the Bank of the West account, and will dismiss this claim without prejudice.

## VII.  Summary judgment in favor of Miller.

It appears from the undisputed facts and the applicable law cited above that Barreras, Hammer, and Drebing are liable in their individual capacities for violation of Miller's constitutional right to procedural due process.  Although Drebing filed an affidavit stating that he had no knowledge that the vehicles had been taken to private tow yards and sold, it is undisputed that he actually approved the seizure of the vehicles and had an affirmative statutory duty to return the vehicles to Miller before they were sold because he and Hammer chose not to file forfeiture proceedings.  But for his refusal to return those vehicles, they could not have been unlawfully sold. A DA may not approve a warrant ordering the seizure of private property, refuse to return it, and then plead ignorance regarding its status and loss to escape liability.

Although Miller did not file a cross-motion for summary judgment, for judicial efficiency, the Court will require these Defendants to file a response attaching any other exhibits or evidence in their possession showing that they should not be held personally liable for that violation, and any other legal arguments *other than the ones previously raised that the Court has already addressed*[7] why summary judgment should not be granted in favor of Miller on his procedural-due-process

---

[7] Defendants are put on notice that if they reassert legal arguments on which the Court has ruled, sanctions may be imposed because the case is complex and the Court does not have the time or resources to reconsider arguments already considered and decided.

claims against them.  *See* FED .R. CIV. P. 56(f) ("After giving notice and a reasonable time to

respond, the court may [] grant summary judgment for a nonmovant; [] grant the motion on grounds

not raised by a party; or [] consider summary judgment on its own after identifying for the parties

material facts that may not be genuinely in dispute.").

**VIII.   Miller has asserted a state-law claim for conversion against Barreras.**

Citing only a case in which the plaintiff brought an action for trespass and conversion against

the New Mexico state highway department and its commissioner of public lands that was dismissed

because the plaintiff's "claims for trespass and conversion are not torts for which immunity has been

waived by the Act," *Townsend v. State ex rel. State Highway Dep't*, 117 N.M. 302, 304, 871 P.2d

958, 960 (1994), the City contends that Miller "cannot maintain a claim for conversion against City

Defendants." Doc. 124 at 21.  To constitute conversion of property, "there must be proof of the

wrongful possession, or of the exercise of a dominion over it in exclusion or defiance of the owner's

right, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Mine*

*Supply, Inc. v. Elayer Co.*  75 N.M. 772, 773-774, 411 P.2d 354, 355 (1966).  Thus, conversion is

an intentional violation of property rights.  The state highway department and its board of

commissioners are not law-enforcement officers.  But the NMTCA specifically exempts from

immunity the liability of police officers for "violation of property rights." N.M.S.A. § 1978, § 4-4-

12.  Because it is category of an enumerated tort excepted from immunity under the NMTCA,

Barreras is not sovereignly immune from suit for conversion.  Because, however, the DA

Defendants are not law-enforcement officials, and because Miller has pointed to no other waiver of

immunity in the NMTCA that applies to them, he cannot state a cognizable claim for conversion

against the DA Defendants.

**IX.   The Defendants have met their burden to demonstrate that no genuine issues of material**

38

**fact exist regarding whether the vehicles at issue were purchased at least in part with money that can be traced to Ms. Beale.**

In support of their contention that all of the vehicles that were seized and sold without due process were purchased, at least in part, with money that may be traced to Ms. Beale, the Defendants have submitted an affidavit and exhibits from their expert, Richard Brody, who also testified in Miller's criminal proceedings.  Miller has not submitted affidavits or other evidence that contradicts Brody's testimony.  Brody determined that, on March 29, 2006, all three of Miller's existing bank accounts (ending in numbers 3858, 1695, and 9585) had  negative or negligible balances.  *See* Doc. 123, Ex. 9 at 3 and Ex. C; *see also* Doc. 134, Ex. 6 at 7 (initial report stating that one of the three accounts "had a small positive balance of $89.12" on 3/29/06).  He testified that Miller opened up additional accounts in April 2006 and transferred money between the various accounts as he obtained it from Beale.

It is undisputed that, as part of Miller's racketeering scheme, he had Beale pay him $3500 (check #687) on March 29, 2006, which he exchanged for a cashier's check, *see* Doc. 134, Ex. 24; $6500 on April 3, 2006 (check # 690), which he deposited into his existing #3858 account, *see id.* Ex. 29 and *id.* Ex. 6 at 10; and $15,000 on April 10, 2006 (check $692), which he cashed and used, in part, to obtain an $8000 cashier's check, *see id.* Ex. 30; Doc. 123, Ex. 9, Ex. D at 2.  Brody established that Miller funded subsequent accounts, including another account he created for his Legal Aid business (#3049) with Beale's money by cashing "approximately $550,000" of Ms. Beale's CDs between April 10 and May 31, 2006 and depositing "the majority of that money" into Miller's #3049 Legal Aid Account.  Doc. 123, Ex. 9 at 4 and attached Ex. C (showing that account #3049 was opened in April 2006).  Brody testified that Miller also received and/or spent "approximately $45,000 of Roberta Beale's money (from her Bank of America checking account

39

9877)" after March 29, 2006. *Id.* It is undisputed that the vehicles that are at issue in this suit were all purchased and/or paid for between April 10, 2006, after Miller cashed Beale's $15,000 check, and June 1, 2006, after Miller had finished depleting Beale's savings and accounts on May 31, 2006.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 2000 BMW 528 on 5/10/06, using a cashier's check taken directly from Beale's checking account. *See id.* at 4 & Ex. D. Miller does not dispute these facts. *See* Doc. 134, Ex. 12 (Miller affidavit). As a matter of law, the 2000 BMW 528 was purchased with Beale's money.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 2004 Lincoln Navigator on May 24, 2006 for $41,336.94 in part by trading in a 2001 Navigator. Doc. 123, Ex. 9 at 5. The 2001 Navigator was purchased in part on April 10, 2006, the same day Miller cashed the $15,000 check #692 from Beale, and finished paying for it on April 24, 2006, after Miller redeemed a $63,000 CD belonging to Beale, *see id.* & att. Ex. D at 2. Miller also financed over $20,000 from Ford Motor Credit to purchase the 2004 Navigator. *See id.* Miller does not dispute these facts. As a matter of law, the 2004 Lincoln Navigator was purchased in part using Beale's money.

Brody testified "to a reasonable degree of certainty" that, although the 1995 Mercedes Benz S Class was partially paid for on 2/24/06 with a $4000 trade-in that was unconnected with Beale, Miller paid for part of the $12,000 balance due with the $8000 cashier's check from Beale $15,000 check #692 on April 10, 2006. *See* Doc. 123, Ex. 9 & att. Ex. D at 4. Miller does not dispute these facts. As a matter of law, the 1995 Mercedes Benz S Class was purchased in part using Beale's money.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 1999 Volvo 880 for $9500 on June 1, 2006 using a check from his Legal Aid account, into which he had

deposited the majority of the money from Beale's CDs.  *See id.* Ex. D at 6.  Miller does not dispute

these facts.  As a matter of law, the 1999 Volvo 880 was purchased using Beale's money.

Brody testified that Miller purchased the 1996 Chevy Suburban for $5500 on May 4, 2006

with cash, and that the same day, he withdrew $8000 from the Legal Aid account in which he had

deposited the majority of the money he illegally obtained from Beale's CDs.  *See id.* Ex. D. at 7.

Miller does not dispute these facts.  As a matter of law, the 1996 Chevy Suburban was purchased

using Beale's money.

Brody testified that Miller purchased the 1995 Suzuki Sidekick on April 12, 2006 for $1500,

one day after he cashed a check from an account funded at least in part with Beale's money (#3858)

and two days after he cashed Beale's $15,000 check  *See id.* Ex. D at 8; *see* Doc. 134, Ex. 6 at 10.

Miller does not dispute these facts.  As a matter of law, the 1995 Suzuki Sidekick was purchased

using Beale's money.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 2001 Cadillac

DeVille on May 11, 2006 for $11,000 using a cashier's check from the Legal Aid #3049 account,

which was principally funded using the majority of the money obtained through illegally cashing

in Beale's CDs.  *See* Doc. 123, Ex. 9 and att. Ex. D at 9.  Miller does not dispute these facts.  As a

matter of law, the 2001 Cadillac DeVille was purchased using Beale's money.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 1994 Cadillac

Seville on May 14, 2006 for $4500 using a check card from the Legal Aid #3049 account, which

was principally funded using Beale's money.  *See id.* Ex. D at 10.  Miller does not dispute these

facts.  As a matter of law, the 1994 Cadillac Seville was purchased using Beale's money.

Brody testified "to a reasonable degree of certainty" that Miller purchased the 1993 Ford

Santara Coachman RV on May 4, 2006 for $11,000, using a cashier's check obtained on May 3,

2006 from the Legal Aid #3049 account. This account was principally funded with Beale's money. Miller does not dispute these facts. As a matter of law, the 1993 Ford Santara Coachman RV was purchased using Beale's money.

Citing his responses to interrogatories, Miller argues that the $25,000 he received from Beale between March 29 and April 10, 2006 was legally obtained, and therefore, some of the vehicles were purchased with his, instead of her, money. *See* Doc. 134, Ex. 7 at 1-2. Legal conclusions in a response are insufficient to rebut facts submitted in a motion for summary judgment. The Court will not permit Miller to attempt to undermine or limit his convictions for racketeering and fraud activities by arguing that part of his actions in regard to Beale were legal. Miller expressly admitted that his illegal course of racketeering conduct began when he met Beale at the psychiatric hospital, realized that she had significant financial resources, and convinced her to pay him a $25,000 nonrefundable "retainer" for his "services" that were supposed to consist only of him being a "medical liaison" but that turned out to be the very vehicle he used to defraud her.

Although Miller suggests that Brody's facts are disputed, *see* Doc. 134 at 2, he has submitted nothing to rebut the specific facts Brody used in arriving at his opinions set forth above. For example, although Miller states that Brody's charts indicate that, on March 29 and 30, 2006, there existed two checks from "Sharareh . . . to . . . . Miller" totaling $15,000, on which Miller relies to show a dispute in the amount of money he had in his existing accounts before he defrauded Beale, Miller provides nothing to show that those checks were deposited into either the new Legal Aid #3049 account, which was the principle source of most of the vehicle purchases (other than monies taken directly from Beale's accounts as noted above), or the existing #3858 account, what they were for, or what happened to them. Brody's charts further show that Miller used the Legal Aid #3049 account, which held the majority of Beale's money after 3/29/06, to provide what appear to be loans

42

to Sharareh and his business for over $61,000 in May 2006.  *See* Doc. 134, Ex. 6 at 12.  Thus, although Miller contends that Brody's reports indicate that he had a "net cash inflow of at least $178,766.89 that cannot be attributed to money from Ms. Beale," the Court must consider that Miller engaged in the racketeering that resulted in the loss of all of Beale's money precisely to assist him in funding and promoting his other endeavors that may have been legal and that Miller transferred Beale's money from one account to the other.  Thus, any benefit Miller received from unlawfully appropriating and using Beale's money also constructively belongs to Beale.  Contrary to Miller's assertions, he has totally failed to provide any evidence to establish a genuine issue of material fact regarding whether he had a "known significant source of legitimate income other than Ms. Beale's money at the time he spent approximately $120,000 on automobile expenditures, including the vehicles which are the subject matter of this lawsuit."  Doc. 134 at 2.  The Defendants have met their burden to show that there are no genuine issues of material fact regarding whether Miller used money obtained from Beale to purchase the nine vehicles.

**X.  Beale is entitled to a constructive trust.**

Although Beale has not moved for summary judgment on the issue of whether she is entitled to a constructive trust regarding the nine vehicles discussed above and the damages caused by their sale, it appears that she is entitled to such a trust as a matter law and that Miller has consented to it.  After Miller discovered that the vehicles had been unlawfully sold, he judicially admitted to the state-court judge that, if he could find an attorney who could get the money back from the sale of the cars, "you can order it returned to Ms. Beale."  Doc. 134, Ex. 21 at 6.  Miller,  Duggers' Services, Inc., Acme Towing & Recovery, Inc., and Munos Wrecker, Inc.  shall submit proof, *in camera,* to the Court regarding the terms and conditions of the settlement of Miller's claims and where any money has been sent or deposited resulting from settlement.  The Court shall also impose

43

a constructive trust on any damages Miller recovers from the DA Defendants, Officer Barreras, and/or the City, with any such proceeds being paid into the registry of the Court as part of the constructive trust imposed in favor of Beale.

## XI. The motion to disqualify.

Miller seeks to disqualify, on the basis of an alleged conflict of interest, Michael F. Hart, who is Ms. Beale's attorney.  Miller contends that the conflict arises from the mere fact that the state Children's Court appointed Hart as Miller's *pro bono* guardian ad litem twenty years ago for a brief period of time, when Miller was the subject of proceedings in the Chidren's Court.  *See* Doc. 125 at 1.  Hart has submitted an affidavit stating that he "ha[s] no actual memory" of his alleged appointment and believes he "was never involved in any substantive or significant matters involving Mr. Miller;" that he "can find no record of [Miller] ever being assigned to [him];" and that any files from that era have been destroyed.  Doc. 126, Ex. D at 3.  He states that Miller told him in 2010 that their "interactions in 1990 or 1991 were very limited, and (according to him) primarily concerned whether the state would buy him a suit coat (jacket) and tie."  *Id.*  Hart correctly notes that the job of a guardian ad litem is not to "represent" the child, but, rather, to serve "as an arm of the court" in assisting the Court in its duty to determine the child's best interests.  *See State v. In re George F.*, 125 N.M. 597, 601, 964 P.2d 158, 163 (Ct. App. 1998).

In his responsive affidavit, Miller states that, during the proceedings in children's court, he told Hart that he

> did not want to return to Philadelphia with my father.  Mr. Hart then relayed my wishes to [the state-court judge].  . . . .  We had several more hearings over this issue and Mr. Hart was there seemingly advocating for my position each time. . . . I remember calling Mr. Hart and requesting that he talk to Ms. Walker about buying me a suit jacket and tie.

Doc. 130, Ex. H at 2.

44

The Court concludes that Mr. Hart's very brief service as a *pro bono* guardian ad litem twenty years ago does not give rise to the kind of actual conflict of interest requiring his disqualification as Ms. Beale's attorney.

Miller next contends that Hart must be disqualified because Hart was listed as a potential witness in this case.  Counsel for the D.A. Defendants has withdrawn Hart as a witness in this matter.  *See* Doc. 126, Ex. C.  Although Miller states that he intends to call Hart as a witness, he states only that he intends to question him for impeachment purposes about Hammer's conversation with him "about ownership rights of Ms. Beale in property bought with her funds by Mr. Miller," Doc. 125 at 2-3 & Ex. 1 at 4; and he further speculates that, "if Mr. Hart answers all questions posed to him while on the witness stand honestly, some of his responses will be adverse to [Ms. Beale's] interest and position in this lawsuit," Doc. 125 at 3.  The Court rejects Miller's contention that Hart is an essential witness.  The issues before the Court regarding Ms. Beale and the seized vehicles relate solely to whether those vehicles were purchased with money that can be traced to her such that she is entitled to a constructive trust on any monies that Miller may ultimately recover associated with the due-process violations that resulted in the vehicles' sales.  In that regard, it does not matter what Hart said to Hammer during the investigation or what he said during other state-court proceedings, and the Court will not disqualify Hart as Ms. Beale's attorney simply so that Miller can attempt to question him.

**IT IS THEREFORE ORDERED** that *Defendants Robin Hammer and Mark Drebing's Motion for Summary Judgment and Memorandum Brief in Support* (Doc. 123) is granted in part and denied in part as set forth above; that Miller's claims for conversion against the DA Defendants are dismissed with prejudice; and that, within twenty days of the filing of this Order, these Defendants shall show cause in writing why summary judgment should not be granted in favor of Miller on his

procedural-due-process claims;

**IT IS FURTHER ORDERED** that the *City Defendants' Motion for Summary Judgment and Memorandum Brief in Support* (Doc. 124) is granted in part and denied in part; that Miller's due-process claims brought against the City under § 1983 are dismissed with prejudice; that all claims against Defendants Kevin Rowe, Carla Perez, and Chadwick J. Melvin are dismissed with prejudice; and that, within twenty days of the filing of this Order, Defendant Marigrace Barreras must show cause in writing why summary judgment should not be granted in favor of Miller on his due-process and conversion claims against her;

**IT IS FURTHER ORDERED** that Miller's *Motion to Disqualify F. Michael Hart from Representing the Intervenor* (Doc. 125) is DENIED.

**IT IS FURTHER ORDERED** that Roberta Beale is entitled to judgment in her favor on her claim for a constructive trust against Miller; that Miller, Duggers' Services, Inc., Acme Towing & Recovery, Inc., and Munos Wrecker, Inc. shall submit, *in camera,* information to the Court regarding the terms and conditions of the settlement of Miller's claims and where any money has been sent or deposited resulting from settlement; and that, if Miller and the Defendants desire to settle this case before trial, that the negotiations must include Beale and/or her attorney and settlement must be approved by Beale.  Absent written consent by Beale's attorney, any such settlement proceeds shall be deposited into the Court's registry.

**IT IS FURTHER ORDERED** that Miller's claim against the DA Defendants for declaratory or injunctive relief regarding his Bank of the West account is dismissed without prejudice.

_____
UNITED STATES DISTRICT JUDGE

46