## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ANDREW J. MILLER**,

      Plaintiff,

vs.                                           **No. CIV-10-171WPJ/LFG**

**DUGGERS TOW YARD, et al.**,

      Defendants,

consolidated with

**ANDREW J. MILLER**,

      Plaintiff,

vs.                                           **No. CIV-09-1124 BB/WPL**

**OFFICE OF THE DISTRICT ATTORNEY FOR
THE SECOND JUDICIAL DISTRICT, et al.**,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Court's February 27, 2012 Order requiring "Defendants Hammer, Drebing, and Barreras to show cause why summary judgment should not be granted in [pro-se Plaintiff Andrew J.] Miller's favor on his procedural-due-process claims." Feb. 27, 2012 MOO at 2. That due-process claim is that Miller's

> constitutional right to due-process was violated when the City, Barreras, Hammer, and Drebing caused eight of the vehicles he owned to be seized and towed to private tow yards in violation of the state-court's orders, and then failed to follow proper procedure and permitted them to be sold by those tow yards before his conviction, without due process, and without any of the money from the sale of the vehicles being applied to the restitution amount he owes to [his fraud and embezzlement

victim, Roberta] Beale.

Feb. 27, 2012 MOO at 14.  Defendant Barreras responded that she had no "further evidence, authority, or arguments to advance" to avoid summary judgment in Miller's favor on those claims. Doc. 156 at 2.  Miller, Barreras, and the City of Albuquerque subsequently negotiated a settlement of all of Miller's claims against those Defendants, the net proceeds of which were placed into the constructive trust for victim Roberta Beale.  *See* Doc. 182 at 1 (noting that the City agreed to pay "$40,000 into the constructive trust set up by the Court.  The parties agreed that up to $3,100 would be paid to Mr. Miller to reimburse him for any costs in the prosecution of this case.").  The Court granted the parties' joint motion to dismiss all of Miller's claims against the City and Barreras with prejudice.  *See* Doc. 190.

Having reviewed Defendants Drebing's and Hammer's responses and Miller's replies, the record, and the applicable law, the Court concludes that summary judgment should be granted in favor of Drebing on Miller's claims against him.  The Court further concludes that summary judgment should be granted in favor of Miller on his procedural-due-process claim against Hammer because there are no genuine issues of material fact regarding Hammer's knowing acts and omissions that resulted in the violation of Miller's right to procedural due process.

## I.     Undisputed facts.

The Court adopts the undisputed facts set forth in its February 27, 2012 MOO.

On July 18, 2006, and again on August 9, 2006 Defendant Officer Marigrace Barreras, an APD officer assigned as the lead detective investigating this case, obtained search warrants at the DA Defendants' direction, *see* Doc. 134, Ex. 14 at 1; Doc. 124 at 3, ¶ 5, to seize numerous vehicles that Miller had allegedly "purchased with funds which were illegally obtained" from Beale.  *See, e.g.*, Doc. 134, Ex. 8 at 2-3 and Ex. 9 at 1-4.  Hammer and Drebing approved the warrants.  *See id.* Ex. 8 at 3, Ex. 9 at 4.  Barreras understood that she was to "impound[] and store[] [the vehicles] for later disposal by the Judge." Doc. 134, Ex. 14 at 1.  Accordingly, the warrants expressly provided that the officer executing the warrant was to "seize the

. . . [listed] property and hold for safekeeping until further Order of the Court" and that the vehicles were to be "towed and to remain *in police custody* until released by a District Court Judge." Doc. 134, Ex. 9 at 1, 3 (italics added). But when they found the various vehicles listed in the seizure warrants, Barreras and other officers called several different private tow companies to tow and store those vehicles at their tow yards. Hammer admits she was aware that the vehicles were towed and stored at the private yards, where they were accruing storage fees, and that at least one of the tow-yard owners was confused about his legal right to dispose of the vehicles. *See* Doc. 134, Ex. 13 at 2-3; *id.* Ex. 45 at 2.

According to Hammer, "the vehicles were to be seized as evidence in the ongoing criminal investigation." Doc. 123, Ex. 1 at 2, ¶ 8. But one of Miller's former attorneys filed an unrebutted affidavit stating that Hammer further told him that "the vehicles . . . were being held *at the expense of the State* as evidence *until she forfeited them under the New Mexico Racketeering Act* . . . ." Doc. 134, Ex. 4 at 1-2 (italics added). Thus it appears undisputed that the vehicles were to be held at the State's expense and in its custody until they either were properly forfeited to the state, or returned to Beale as the proceeds of racketeering by court order, or returned to Miller if no forfeiture action was filed or if they were *not* found to be the proceeds of racketeering. *See* N.M.S.A. 1978 § 30-42-4(E)(1) (providing that persons found guilty of racketeering "shall forfeit to the state of New Mexico [] any interest acquired or maintained in violation of the Racketeering Act"); N.M.S.A. 1978 § 30-42-4(F) (Racketeering Act section providing that "[t]he provisions of the Forfeiture Act apply to the seizure, forfeiture and disposal of property described in Subsection E of this section"); N.M.S.A. 1978 31-27-2 (stating that one purpose of the Forfeiture Act is "to protect the constitutional rights of persons accused of a crime and of innocent persons holding interests in property subject to forfeiture"); N.M.S.A. 1978 § 31-27-8 B (Forfeiture Act section providing that "[s]eized property other than currency or real property, not required by federal or state law to be destroyed, shall be [] (1) placed under seal; and (2) removed to a place designated by the district court; or (3) held in the custody of a law enforcement agency").

But it is further undisputed that neither Hammer nor any other official ever filed a complaint for forfeiture of the seized vehicles under the Forfeiture Act. *See* Doc. 134, Ex. 22 at 2; Doc. 45 at 3; N.M.S.A. 1978 31–27–5(A) ("Within thirty days of making a seizure, the state shall file a complaint of forfeiture or return the property to the person from whom it was seized."). . . . .

The APD requires its investigating officers, such as Barreras, to "initiate the forfeiture procedure by completing" a form and forwarding it to the Special Investigations Division ["SID"] within ten days of seizing property that *may* be subject to forfeiture. *Id.* at 2-37-1(B). If a vehicle is seized that may be forfeited under state law, it must "be towed to the 4th Street yards" by "a police department wrecker" if the vehicle is seized Mondays through Fridays between 6:30 a.m. and 10:30 p.m. *Id.* at 2-37-2(A). Thus, there usually are no commercial towing or

storage expenses incurred for vehicles that may be later forfeited under state law for violations of law that permit forfeiture.

Under APD's forfeiture policy, the investigating officer must obtain a title/lien history on the vehicles and fill out certain forms; take photographs and tag them into evidence; and remove and return to its owner any personal property in the vehicle. *Id.* at 2-37-2(D), (E).  The vehicles are then categorized according to condition and value and stored at one of two city impound areas. *See id.* at 2-37-2(E). The SID must "monitor[] the progress and time limits on all forfeiture or intended forfeiture proceedings," and must route a "forfeiture request and completed case to the department Legal Advisor, within twenty days of seizure." *Id.* 2-37-3.  The department's "Legal Advisor is solely responsible for all litigation." *Id.* at 2-37-4(A). If a seized vehicle is to be returned to a legal or equitable owner instead of being forfeited, the Legal Advisor's Office notifies the department's Property Management Division, who then notifies the legal or equitable owner and physically returns the vehicle to him or her. *See id.* at 2-37-8. The APD's forfeiture policy, therefore, is consistent with state law.

Under APD policy, a vehicle seized *solely as evidence* and that is *not* intended for forfeiture, on the other hand, is normally "processed at the scene," *id.* at 2-48-5(A), and if it is not immediately processed and released to the owner, it is towed by a commercial tow service to APD's Metropolitan Forensics Science Center, where it "must be processed within 48 hours, excluding weekends," *id.* at 2-48-5(C), (E).  After processing, the vehicle is towed to "the original wrecking company['s]" storage yard, which will make arrangements with the owner for release because "towing charges need to be paid by the owner." *Id.* at 2-48-5(F).  If the towed vehicle belongs to a victim or a crime suspect, "a police hold may be initiated on a tow form . . . *for a maximum of 72 hours.*" *Id.* at 2-48- 6(A)(1) (italics added). "Vehicles towed for evidence will be stored at the wrecking yard that tows the vehicle." *Id.* at 2-48-6(C)

> After a vehicle has been processed, the investigating officer will notify the owner of its release [either] by . . . complet[ing] two copies of the release form [] and giv[ing] one copy to the owner of the vehicle to present to the towing service . . . [or by] . . . complet[ing] two copies of the release form [] and deliver[ing] one copy to the towing service so as to authorize it to release the vehicle to the owner. The second copy will be forwarded to Records who will mail a photocopy to the address of the registered owner.

*Id.* at 2-48(D).  Thus, APD policy is that, after a vehicle has been processed solely as evidence, it must be released to the owner or victim after payment of the tow and storage fees, if any, and that a vehicle seized for evidentiary purposes may be stored only for a maximum of three days before it is released.

Officer Barreras was assigned the duty to "sort through property that is seized to decide which property should be kept as evidence and which property should be released back to its original owner." Doc. 124, Ex. A at 2. Defendant Hammer talked with Barreras about "the evidentiary value of the [seized] property;" Hammer spoke with a representative from Acme Towing who called seeking legal advice on disposal of Miller's vehicles in its possession; and she spoke with the City of Albuquerque's legal counsel, who told her that the City "was unable to pay vehicle storage fees in this case." Doc. 134, Ex. 13 at 2-3. But it is undisputed that Barreras never notified Miller that any of the seized vehicles had been processed solely as evidence and were ready for release. *See* Doc. 134, Ex. 12 at 2 (Miller's Affidavit stating that "he was never given any notice as to where any of these vehicles where [sic] being stored or when they were being disposed of"). And, as noted above, when Miller's attorneys each separately asked Hammer about the status of the vehicles, she informed them that they were being held either as evidence or in anticipation of forfeiture. *See* Doc. 134, Ex. 22 (Affidavit of Donald Kochersberger III, Miller's first attorney, swearing that he contacted Hammer regarding her intention to release the seized vehicles; that she informed him that some vehicles "were being returned to individuals other than Mr. Miller because her office and/or the [APD] had determined that they didn't belong to Mr. Miller" and that the remaining vehicles "would be held indefinitely as evidence in the case against Mr. Miller"); *Id.*, Ex. 4 at 1-2 (Affidavit of Jeffrey Jones, Miller's second attorney, swearing that he contacted Hammer in February 2008 "to inquire about the status of the vehicles that had been seized" and that she told him that "the vehicles . . . were being held at the expense of the State as evidence until she forfeited them under the New Mexico Racketeering Act . . . ."). It is undisputed that Officer Barreras told Miller's mother, who had been driving a Volvo that Miller had purchased in June 2006 and that was seized on August 11, 2006 as proceeds of racketeering and/or fraud, that she could not get the Volvo back "without a court order . . . [which] would have to be initiated by the Office of the District Attorney." Doc. 134, Ex. 11 at 1; Doc. 151, Ex. 3 at 5. But even though Barreras has been an APD officer for ten years and regularly "investigated cases of fraud, embezzlement, racketeering, and other white collar crimes," as a "lead detective," Doc. 123, Ex. 10 at 1, she states that she has "no knowledge of how property seized pursuant to a search warrant is forfeited or disposed of," although she believes "there may be an [APD] standard operation procedure that addresses this issue," Doc. 124, Ex. A at 3.

As noted above, despite the fact that it appears that all vehicle seizures occurred between Monday and Friday and between 6:30 a.m. and 10:30 p.m., when police wreckers should have been available, all of the seized vehicles were towed by, and stored at, commercial towing-company yards.

Under New Mexico law,

all garage owners and persons engaged in the business of towing automobiles, storing automobiles or furnishing wrecker service shall

5

have a lien on all automobiles towed, stored or upon which wrecker
service is performed when such towing, storage or wrecker service
is furnished or performed at the request or with the consent of any
person lawfully in possession of such automobile [including a peace
officer who has requested towing], for the reasonable value of such
services and for costs incurred in enforcing the lien.

N.M.S.A. 1978, § 48-3-19.  Beginning in September 2006, despite the state-court
seizure order providing that the vehicles were to remain "in police custody" pending
further court order, the tow companies began enforcing their statutory liens against
the towed vehicles, selling them to themselves at "public auction" for the amount of
the towing, storage, and administrative fees.  *See* Doc. 124 at 5, ¶ 13; Doc. 123, Ex.
11-1 (Dugger's Services' lien on 2000 BMW 528 for $297.57; sold on 9/20/06 to
Dugger's for amount of lien); *id.* Ex. 11-2 (Acme Towing lien on 2004 Lincoln
Navigator for $210.27; sold to Acme on 9/6/06 for amount of lien); *id.* Ex. 11-3
(Acme Towing lien on 1995 Mercedes Benz S for $3,365.58; sold to Acme on
10/10/07 for amount of lien); *id.* Ex. 11-4 (Acme Towing lien on 1999 Volvo S80
for $3,305.58; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-5 (Acme
Towing lien on 1995 Chevrolet K15 Suburban for $3,278.28; sold to Acme on
10/10/07 for amount of lien); *id.* Ex. 11-6 (Acme Towing lien on 1995 Suzuki
Sidekick or $3,226.22; sold to Acme on 10/10/07 for amount of lien); *id.* Ex. 11-7
(Acme Towing lien on 1994 Cadillac for $3,624.06; sold to Acme on 10/10/07 for
amount of lien); *id.* Ex. 11-8 (Acme Towing lien on 1993 Ford Santara Coachman
RV for $3,206.43; sold to Acme on 10/10/07 for amount of  lien).

Each of APD's "Tow-In Reports," a copy of which was given to the tow
companies and one of which was supposed to be given to the vehicle's "owner," but
none of which were given to Miller, had the box for "Hold on Car?" checked as
"yes" and the "reason" given as either "embezzled vehicle," Doc. 151, Ex. 5 at 1; *id.*
Ex. 4 at 5; "warrant," Doc. 151, Ex. 3 at 6; *id.* Ex. 7 at 5; or "seizure," Doc. 151, Ex.
5 at 6, *id.* Ex. 6 at 5. Barreras left a "return and inventory" with Virginia Harris, who
is Miller's mother, on October 19, 2006 stating that Barreras had executed a warrant
to seize the 2000 BMW on July 12, 2006 and further stating, "vehicle seized and is
to remain at Acme Towing 8705 Broadway until further orders are received by a
district court judge." Doc. 151, Ex. 3 at 5.  As noted above, however, before Acme
Towing sold the 2004 Lincoln Navigator to itself in September 2006, it contacted
Hammer seeking advice, but she told them she could not give them legal advice and
confirmed with the City that it would not pay for storage fees.  *See* Doc. 134, Ex. 13
at 3.  She also spoke with Ford Motor Credit during this time, which had a purchase-
money lien on the Lincoln Navigator, and told them that it was being held at Acme
Towing.  *See id.* . . . .

At the August 8, 2008 guilty-plea hearing, Hammer informed the court that
Miller claimed he owned "a [seized] Mercedes, which he purchased prior to illegally
obtaining Roberta Beale's money," and said that she had "informed [Miller] that if

that were true, we would not forfeit that Mercedes." Doc. 134, Ex. 5 at 3.  The judge
repeated that the stipulated forfeiture order was only for "property that can be traced
to Mrs. Beale." *Id.* at 4.  Miller was supposed to submit documentation to Hammer
to prove his claim, see id. at 3, and Miller's attorney states that he submitted a
proposed order regarding specific vehicles to Hammer, but Hammer never responded
to Miller's claim and no additional orders regarding any vehicles was ever entered.
*See* Doc. 134, Ex. 4 at 2.  Of course, unbeknownst to Miller, Acme Towing had
already sold the Mercedes to itself almost a year earlier, on October 10, 2007, so
there was no way Hammer could return the Mercedes to Miller even if she agreed
that it was purchased only with Miller's money - and not with money he obtained
from Beale.  *See* Doc. 134, Ex. 12 at 2 (Miller Affidavit); Doc. 123, Ex. 11- 3.

Feb. 27, 2012 MOO at 6-13.  The Court found that "the DA Defendants had a duty under the

Forfeiture Act to return the vehicles to Miller within 30 days of their seizure because they did not

file a complaint for forfeiture in his criminal proceeding."  Feb. 27, 2012 MOO at 17.  The Court

also stated:

> It seems clear that officers and DAs who give possession and absolute and
> indefinite control of property to a third party – contrary to court order – by using
> their police powers, and then refuse to release the property to a defendant and leave
> it with the third party to do as it pleases, notwithstanding constitutional protections,
> specific statutes, and APD policy directives to the contrary, may be held liable for
> the permanent taking of that property without due process or compensation. As
> noted, the state-court's seizure order required Officer Barreras and the DAs to ensure
> that Miller's vehicle's were retained in police custody. APD policy required Barreras
> to release the vehicles to Miller within three days. The Forfeiture Act required
> Hammer and Drebing to give the vehicles back to Miller within 30 days of their
> seizure. But because none of them ever authorized the release of the vehicles to
> Miller, the tow companies, which were still holding the vehicles on behalf of the
> state - and not on behalf of Miller - unlawfully sold them..

*Id.* at 30.  The Court further stated:

> It appears from the undisputed facts and the applicable law cited above that
> Barreras, Hammer, and Drebing are liable in their individual capacities for violation
> of Miller's constitutional right to procedural due process.  Although Drebing filed
> an affidavit stating that he had no knowledge that the vehicles had been taken to
> private tow yards and sold, it is undisputed that he actually approved the seizure of
> the vehicles and had an affirmative statutory duty to return the vehicles to Miller
> before they were sold because he and Hammer chose not to file forfeiture
> proceedings.  But for his refusal to return those vehicles, they could not have been
> unlawfully sold.  A DA may not approve a warrant ordering the seizure of private

property, refuse to return it, and then plead ignorance regarding its status and loss to escape liability.

*Id.* at 37.  But the Court gave the Defendants an opportunity "to file a response attaching any other exhibits or evidence in their possession showing that they should not be held personally liable for that violation, and any other legal arguments *other than the ones previously raised that the Court has already addressed*."  *Id.* (italics in original).  The Court further found as undisputed that "the vehicles that are at issue in this suit were all purchased and/or paid for between April 10, 2006, after Miller cashed Beale's $15,000 check, and June 1, 2006, after Miller had finished depleting Beale's savings and accounts on May 31, 2006."  *Id.* at 40.

The Court notes the following additional facts.  Miller settled his claims against Duggers Services, Inc. for conversion of the BMW 528 for $1000 on September 10, 2010.  In July 2010, Miller settled his claims for conversion against Acme Towing and Recovery for $1000 plus the return of a 2000 Ford Crown Victoria and a 1999 Ford Taurus, with their titles.  The New Mexico Court of Appeals reversed Miller's convictions on March 16, 2012, holding that the district court violated Miller's plea agreement by sentencing him to two years more than the plea agreement provided.  *See* Doc. 163, Ex. 1.  The Court of Appeals gave Miller the option of withdrawing his plea or being resentenced in accordance with the terms of the plea agreement.  *See id.* at 24.  The record does not indicate the current status of Miller's criminal case.

### III.     Analysis

### A.  Drebing is entitled to summary judgment.

Drebing again raises several arguments that the Court already addressed in its February 27, 2012 MOO, and which the Court instructed Drebing that he should not revisit, including whether Miller had a property interest in several vehicles; whether Miller waived his right to complain about

any constitutional violations by executing his plea agreement; and that he is entitled to absolute prosecutorial immunity. *See* Doc. 161 at 9-12. He also contends that he cannot be held liable for mere negligence. *See id.* at 12-15. Attaching his affidavit, Drebing states that he "did not enter an appearance in *State v. Miller*, D-202-CR-2006–3283, and he did not direct or supervise the actions or decisions of Ms. Hammer in that case." Doc. 161, Ex. 1 at 1. He swears that he "was not involved in any decision or action regarding when or how the disposition of the vehicles at issue in this lawsuit would be determined;" that he "did not at any time refuse to determine the disposition of the vehicles, or refuse to return them to Plaintiff;" and that he "never knew the actual location or disposition of any of the vehicles at issue before this lawsuit was filed." *Id.* at 2. He states that he "had no reason to believe that others would act contrary to the search warrants, which indicated that seized property would be held 'for safekeeping until further Order of the Court.'" *Id.* at 3. He argues that his "actions were limited to reviewing affidavits for sufficient probable cause to obtain search warrants to garner evidence to support the criminal racketeering prosecution against Plaintiff, and gaining a general familiarity with the case in the event that he might have to serve as co-counsel to Ms. Hammer at trial," *id.* at 1, thus Miller cannot show that Drebing "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive" Miller of his constitutional rights to due process. Doc. 161 at 2. He further contends that his "failure to follow up on a facially valid forfeiture procedure that the Court has established was administered by A.P.D., and which was not followed by Det. Barreras and A.P.D.'s legal advisor unbeknownst to Mr. Drebing, is at worst ordinary negligence, which cannot ground a constitutional violation as a matter of law." *Id.* at 3.

The Court agrees that the Tenth Circuit requires that Miller must produce evidence tending to show that Drebing actually knew of, and acquiesced in, the unconstitutional behavior that resulted

in damages to Miller because, if Miller is able to produce such evidence,

> [d]enying qualified immunity on the basis of such a showing complies with *Iqbal's* requirement that § 1983 liability *only* be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation.

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

In response, Miller contends that Drebing signed one of the search warrants and was listed as one of the prosecutors on his plea agreement, and he attaches the transcript of a March 31, 2008 hearing at which Drebing represented the State in the criminal prosecution and questioned Miller extensively about whether Miller received the grand jury's target letter informing Miller that he was being investigated for the crimes on which he ultimately pleaded guilty.  *See* Doc. 163 at 3, 27, 31-42. None of this evidence, however, calls into question Drebing's sworn testimony or tends to show that Drebing knew that Barreras had not complied with the warrant or with the APD written policies and forfeiture law requiring the state to release property that is only going to be used as evidence, or that Drebing knew at any time before the vehicles were sold that they were in the possession of the tow yards instead of APD.  Miller cannot show a causal nexus between Drebing's actions and knowledge and the violations that began in September 2006 and ended in October 2007, long before the plea agreement was negotiated.  Therefore, Drebing is entitled to summary judgment on Miller's claims for violation of procedural due process.

**B.  Miller is entitled to summary judgment on his claims against Hammer.**

The same is not true for Hammer, however.  As noted in the February 27, 2012 MOO, it is undisputed that Hammer actually knew, before any of the vehicles were sold, that they had not been returned to Miller within thirty days of their seizure; that she had not filed a motion to forfeit the vehicles in his criminal case; that the vehicles were in the tow yards' possession; and that the tow

yards asked her if they could sell them to recover the storage fees that the City refused to pay.

Hammer misstates the basis of her liability.  She states that the

vital link in this causal chain is an alleged breach of Hammer's 'affirmative duty' to commence proceedings under the Forfeiture Act ('the Act') pertaining to the vehicles at issue in this lawsuit, notwithstanding the Court's findings that A.P.D.'s 'Legal Advisor is *solely* responsible for *all* litigation' to forfeit seized property, pursuant to a forfeiture policy that is 'consistent with state law,' . . . and despite the fact that A.P.D. Detective Marigrace Barreras 'acted *contrary* to the warrants' and contrary to A.P.D.'s lawful policy, without Hammer's knowledge or direction.

Doc. 164 at 1-2.  Hammer focuses on the City's forfeiture policy and seeks to deflect her responsibilities as the prosecutor for the State under the Forfeiture Act to the City's legal advisor, contending that, like Drebing, her mere failure to ensure that A.P.D. followed **its** "forfeiture policy" was negligence, at most.  *See* Doc. 164 at 3.  But Hammer's breach did not consist of a failure to ensure that APD followed its policy or a failure to **commence** forfeiture proceedings but, rather, as the prosecutor assigned to the criminal case, a failure to cause the vehicles to be released to Miller by court order in the criminal case as required by **state** law.  It is of no moment that Hammer did not *direct* Barreras to have the cars unlawfully stored at the private tow yards.  Once she knew that they were there instead of in APD custody, *see* Doc. 134-1 at 19 (Hammer's sworn interrogatory stating that she talked with Barreras about "vehicles in possession of Acme Towing"); that the vehicles had been incurring storage fees that the City was not going to pay; that the tow-yard owners were seeking to sell them; that she was not going to file a forfeiture complaint in Miller's criminal complaint; and that the warrant she signed off on required their safekeeping until a court order permitted their release, she had an affirmative duty to take action to abide by the warrant and the Forfeiture Act.  Barreras swore that Hammer "directed" her to obtain search warrants for the vehicles so that they "could be impounded and stored for later disposal by the Judge."  Doc. 134-1 at 24.  The Forfeiture Act provides that forfeiture proceedings "shall be brought in the same

proceeding as the criminal matter." N.M.S.A. § 31-27-6(C). If it was not Hammer's responsibility, as the prosecuting attorney assigned to the case, to either file a forfeiture complaint in Miller's criminal proceedings or obtain a release of the vehicles to Miller by court order, then whose was it?

Hammer now states that she did not know that "Barreras failed to notify [Miller] that the vehicles . . . were ready for release" to him, Doc. 164-1 at 2, but that statement is in direct conflict with her prior sworn testimony and other evidence conclusively demonstrating Hammer's knowledge that the vehicles had never been released to Miller, and, therefore, does not create a genuine issue of disputed fact. First, Hammer formerly swore that she did not "ever" agree "to return those vehicles" to Miller. Doc. 134-1 at 20. If, as she says, Hammer and Barreras communicated about the evidentiary value of the vehicles and Hammer never agreed to release the vehicles to Miller, Hammer obviously would also know that Barreras did not notify Miller that the vehicles were ready for release to him because they weren't. And Hammer admits that Barreras contacted Hammer about whether to permit Miller's mother, Virginia Harris, to take Harris's personal items from one of the seized vehicles that was being stored *instead of* releasing the vehicle itself. *See* Doc. 164 at 3; Doc. 164-2 at 3 (Barrera's interrogatory answer stating that she communicated with Hammer about permitting Harris to take personal items); Doc. 134-1 at 14 (Harris's affidavit stating that Harris called APD after the vehicle was seized on August 11, 2006 to see when she could get it back; that Barrerras met her "at some point" later and permitted her to take her belongings but told her that "the car could not be released without a court order . . . [that] would have to be initiated by the Office of the District Attorney"). Second, Hammer admits that she talked with Acme tow yard's owner in the summer of 2007, before the bulk of the vehicles were sold, who informed her that he still had the vehicles but wanted to sell them. *See* Doc. 164 at 3-4; Doc. 134-1 at 19. She twice told Ford Motor Credit, when it inquired about one of the vehicles soon

after it was seized in j2006, that it was "at Acme Towing." Doc. 134-1 at 20. So she clearly knew where the vehicles were being stored. Third, as noted in the February 27, 2012 MOO, Hammer admits she spoke with two of Miller's attorneys about the vehicles when they called to inquire about them, *see* Doc. 164 at 3, 5-6, and she does not rebut Kochersberger's (Miller's first attorney) affidavit swearing that Hammer told Kochersberger early in the case that some of the vehicles were being returned to other individuals, but that "the rest of the vehicles would be held indefinitely as evidence in the case against Miller." Doc. 134-1 at 41-42. Nor does she seek to rebut Jones' (Miller's second attorney) affidavit stating that Hammer also told him in February 2008 that the vehicles had been seized under the Forfeiture Act and were being held until they were forfeited. *See* Doc. 134 at 17-18. She further represented to the state district court in August 2008 that the State *still* had custody of the vehicles, but that "we" would not forfeit vehicles that Miller could prove he purchased before he defrauded Beale. Doc. 134 at 22. Hammer now curiously suggests that the attorneys' "inquiries did not involve the vehicles that are at issue in this lawsuit," because they were talking only about vehicles that Miller purchased before he defrauded Beale. *See* Doc. 164 at 13. That contention is without any support in the record. Miller's procedural due process claims involve the eight vehicles that were seized and not returned to him within thirty days of seizure. As a matter of law, because she refused to release the vehicles to Miller or his attorneys, Hammer is liable for knowingly permitting the seized vehicles to be sold by third parties in violation of Miller's rights to procedural due process. At the very least, she was deliberately indifferent to that violation.

Hammer sets out some allegedly disputed facts regarding the "extent of" Miller's property interest in the seized and sold vehicles. *See* Doc. 164 at 8. But those disputed "facts" go only to the amount of damages – not to Hammer's liability. Further, the Court has already addressed most of Hammer's arguments in the February 27, 2012 MOO and will not do so again. Nor will the Court

13

again address Hammer's arguments that the Court already rejected in its February 27, 2012 MOO – whether Miller had a property interest in several vehicles; whether Miller waived his right to complain about any constitutional violations by executing his plea agreement, and whether Hammer is entitled to absolute prosecutorial immunity.

Contrary to Hammer's assertions, this case is not about "maintaining the chain of evidence for criminal prosecutions," and there are no "dramatic differences" between the facts of this case and the facts underlying the opinion in *Coleman v. Turpen*, 697 F.2d 1341 (10th Cir. 1982).  *See* Doc. 164 at 15.  The Court has never implied that a prosecutor must maintain the chain of custody of evidence in every criminal case.  Rather, this case is about a prosecutor's duty to follow state law that gives a criminal defendant an expectation that his property rights in seized property under New Mexico's Forfeiture Act will be protected by due process.  The Forfeiture Act, not this Court, placed the burden of either returning seized evidence or filing a complaint for forfeiture of that evidence on the State through its prosecutors.  As the Supreme Court and Tenth Circuit have noted,

> Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  Thus, constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials.

*Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003).

This case also is not about supervisory liability or any duty to ensure that APD complies with its forfeiture policy.  Hammer is charged with knowing the state law regarding seizure of property in a criminal case, even if she has never filed a forfeiture complaint in one of her criminal cases. Certainly, she knew that the judge had ordered that the vehicles were to remain in the State's custody until he ordered otherwise. The Court has painstakingly set out the undisputed facts

demonstrating that Hammer, like the defendant in *Coleman*, knew that Miller's rights to procedural due process would be violated by her failure to properly return the seized vehicles to Miller and her subsequent decision to turn her back while the third parties sold the vehicles that were supposed to be held in the State's custody until the judge ordered their release.  Hammer's "own individual action[]," *Dodds*, 614 F.3d at 1199, of expressly refusing to release the vehicles to Miller within thirty days of their seizure, or even after Kochersberger contacted her, seeking their return, was the first intentional act that ultimately resulted in Miller's permanent deprivation of those vehicles and any equitable benefit he was entitled to receive from their sale.  A jury may determine the proper award of damages on this claim. It appears that this claim against Hammer for damages is the only claim that will need to be set for trial, all other claims against all other Defendants having been either voluntarily dismissed or dismissed by order and/or prior settlement.

　　　**IT IS ORDERED** that Defendant Drebing is entitled to summary judgment in his favor on Miller's claims; and that Miller is entitled to summary judgment on his procedural-due-process claim against Defendant Hammer.

_____
UNITED STATES DISTRICT JUDGE